**MARVIN LUMBER AND CEDAR COMPANY and Marvin Windows of Tennessee, Inc., Plaintiffs,**

v.

**PPG INDUSTRIES, INC., Defendant.**

**No. Civ. 4–95–739 ADM/RL.**

United States District Court,
D. Minnesota.

Jan. 15, 1999.

Robert R. Weinstine, Winthrop & Weinstine, P.A., St. Paul, MN, for plaintiffs.

Mark B. Levinger, Assistant Attorney General for the State of Minnesota, for State of Minnesota, amicus curiae.

Michael T. Nilan, Halleland Lewis Nilan Sipkins & Johnson, P.A., Minneapolis, MN, Professor Fred Morrison, University of Minnesota Law School, for defendants.

## MEMORANDUM OPINION AND ORDER

MONTGOMERY, District Judge.

### I. INTRODUCTION

The above-entitled matter came on for hearing before the undersigned United

States District Judge on October 30, 1998, pursuant to Plaintiffs' objections to Magistrate Judge Raymond L. Erickson's August 6, 1998 Report and Recommendation ("R & R"). After an extensive evaluation of the voluminous record in this lawsuit, Judge Erickson recommends that: (1) Plaintiffs' Motion to Revise Earlier Orders be denied; (2) Defendant's Motion for Summary Judgment on Plaintiffs' Legal Claims be granted; and (3) Defendant's Motion for Summary Judgment on Plaintiffs' Damages Claims be denied, as moot. Plaintiffs object to nearly every legal conclusion arrived at in the R & R and, in addition, move for certification of the following question to the Minnesota Supreme Court: "Whether Minnesota's Economic Loss Doctrine bars Plaintiffs' common law fraud and misrepresentation claims?" For the reasons set forth below, the Court rejects, as unnecessary, Magistrate Judge Erickson's conclusion that the 1998 Amendment to Minnesota Statute Section 604.10 is unconstitutional, but otherwise adopts the R & R in its entirety. Plaintiffs' Request to Certify Question of Minnesota Law is denied. Judgment is therefore entered in favor of Defendant.

## II. BACKGROUND

The procedural and factual background of this matter is thoroughly and accurately set forth in the R & R and will not be fully repeated here.[1] Suffice it to say that Plaintiffs Marvin Lumber and Cedar Company, a Minnesota corporation, and Marvin Windows of Tennessee, Inc., a Tennessee corporation (hereinafter, collectively referred to as "Marvins"), commenced this action in April 1994 after they became dissatisfied with a wood preservative product—PILT—that they had purchased from Defendant PPG Industries,

Inc. ("PPG"), a Pennsylvania corporation, between February 17, 1985, and December 11, 1988. Marvins allege that PPG's PILT directly resulted in premature wood rot and deterioration in the frames of the doors and windows which Marvins manufactured and sold during the period of time in which PILT was employed as Marvins' preservative.[2]

On March 17, 1995, Judge Michael J. Davis of this Court dismissed with prejudice Marvins' common law tort claims—Counts V, VI, VII, and XIII—to the extent that the claims sought to recover any damages beyond those for "damage to other property." The dismissal was premised upon both the common law and statutory versions of the Economic Loss Doctrine. See Order of March 17, 1995 at 12. Thereafter, on November 1, 1995, Judge Davis affirmed his earlier ruling, by adopting the Report and Recommendation of Magistrate Judge John M. Mason, dated October 13, 1995, which denied Marvins' request to replead claims which had been dismissed with prejudice in the prior Order. Marvins now ask this Court to revise the earlier Orders by reinstating their claim for common law fraud and misrepresentation or, in the alternative, to certify the question to the Minnesota Supreme Court. PPG moves for summary judgment on all of Marvins' legal and damage claims.

## III. STANDARD OF REVIEW

A district court must make an independent, *de novo* evaluation of those portions of an R & R to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. See 28 U.S.C. § 636(b)(1)(C) and Local Rule 72.1(c)(2). Summary judgment is appropriate if there is

---

1. Although Marvins object to most of the legal conclusions in the R & R, they do not contest Judge Erickson's recitation of the factual and procedural background of this matter. To that end, Judge Erickson's factual conclusions are adopted. The pertinent factual detail relevant to Marvins' objections will be incorporated into the discussion below.

2. Marvins' First Amended Complaint asserts the following claims: (I) Breach of Contract; (II) Breach of Express Warranty; (III) Breach of Implied Warranty of Merchantability; (IV)

Breach of Implied Warranty of Fitness for a Particular Purpose; (V) Negligence; (VI) Strict Liability; (VII) Fraud and Misrepresentation; (VIII) Unlawful Trade Practices in Violation of Minn.Stat. § 325D.13; (IX) Violation of the Prevention of Consumer Fraud Act, Minn.Stat. § 325F.67; (XI) Unfair and Deceptive Trade Practices in Violation of Tenn.Code § 47–18–104; (XII) Violation of the Tennessee Consumer Protection Act of 1977, Tenn.Code § 47–18–101, *et seq.*; and (XIII) Fraudulent Concealment.

no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Unigroup, Inc. v. O'Rourke Storage & Transfer Co.,* 980 F.2d 1217, 1219–20 (8th Cir.1992). The court determines the materiality of particular facts from the substantive law governing a claim. *See Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Disputes over facts which might affect the outcome of the lawsuit according to applicable substantive law are material. *Id.* A material fact dispute is "genuine" if the evidence is sufficient to allow a reasonable jury to return a verdict for the non-moving party. *Id.* at 248–49, 106 S.Ct. 2505.

## IV. DISCUSSION

Magistrate Judge Erickson concluded that the Minnesota Economic Loss Doctrine prohibits Marvins from any tort law-based theory of recovery. Because Marvins' UCC contract remedies are barred by the statute of limitations and their consumer protection claims are legally inadequate, it is recommended that PPG's Motion for Summary Judgment be granted. The following discussion analyzes Marvins' objections and arguments vis-à-vis: (A) the impact of the common law and statutory Economic Loss Doctrine; (B) the case for certification; (C) arguments for tolling of the UCC statute of limitations; (D) remedies for consumer fraud; and, (E) Marvins' damage claims.

### A. The Minnesota Economic Loss Doctrine

■ Under the Economic Loss Doctrine, a commercial purchaser of a product is precluded from recovering economic damages through a tort action against the manufacturer or seller of that product. Plaintiffs in such a case are limited to available contract and warranty remedies under the Uniform Commercial Code ("UCC"). The doctrine is premised on the notion that, in complex commercial dealings between sophisticated parties, the UCC must serve as a dependable and predictable structure for determining liability—i.e., the consistent framework which parties can rely upon in negotiating contract terms and allocating risks associated with commercial agreements.

### 1. Background

The Economic Loss Doctrine was first formally articulated by the Minnesota courts in the 1981 case of *Superwood Corp. v. Siempelkamp Corp.,* 311 N.W.2d 159 (Minn.1981), *overruled on other grounds, Hapka v. Paquin Farms,* 458 N.W.2d 683 (Minn.1990). *In Superwood,* the court explained:

> The UCC clarifies the rights and remedies of parties to commercial transactions. For example, there are specific provisions covering warranties, *see* Minn.Stat. § 336.2–314 (1980); warranty disclaimers, *see* Minn.Stat. § 336.2–316 (1980); liability limitations, *see* Minn.Stat. § 336.2–719 (1980); and notice provisions, *see* Minn. Stat. § 336.2–607 (1980). The recognition of tort actions in the instant case would create a theory of redress not envisioned by the legislature when it enacted the UCC. Furthermore, tort theories of recovery would be totally unrestrained by legislative liability limitations, warranty disclaimers and notice provisions. To allow tort liability in commercial transactions would totally emasculate these provisions of the UCC. Clearly the legislature did not intend for tort law to circumvent the statutory scheme of the UCC.

311 N.W.2d at 162. Minnesota decisional and statutory law further refined the doctrine during the next decade, but the essential articulation remains relatively unchanged from *Superwood:*

> [E]conomic losses that arise out of commercial transactions, except those involving personal injury or damage to other property, are not recoverable under the tort theories of negligence and strict products liability.

*Id.* at 162.[3]

### 2. Section 604.10 and the 1998 Special Session Amendment

In 1990, the Minnesota Supreme Court overruled *Superwood*'s "damage to other

---

**3.** A carefully detailed description of the historical evolution of the Economic Loss Doctrine in

property" exception to the Economic Loss Doctrine in *Hapka v. Paquin Farms*, 458 N.W.2d 683 (Minn.1990). The Minnesota Legislature responded a year later by codifying its own version of the Economic Loss Doctrine which, among other things, reinstated the availability of tort recovery for "damage to other property." Section 604.10, as originally enacted, provided as follows:

(a) Economic loss that arises from a sale of goods that is due to damage to tangible property other than the goods sold may be recovered in tort as well as in contract, but economic loss that arises from a sale of goods between parties who are each merchants in goods of the kind is not recoverable in tort.

(b) Economic loss that arises from a sale of goods, between merchants, that is not due to damage to tangible property other than the goods sold may not be recovered in tort.

(c) The economic loss recoverable in tort under this section does not include economic loss due to damage to the goods themselves.

In 1993, the Legislature amended Section 604.10, adding the following provision:

(d) The economic loss recoverable in tort under this section does not include economic loss incurred by a manufacturer of goods arising from damage to the manufactured goods and caused by a component of the goods.

■ In opposing PPG's motion for summary judgment in early 1998, Marvins argued that Judge Davis and Judge Mason had erred in retroactively applying Section 604.10 to the transactions at issue in this case which took place 3–5 years prior to the statute's enactment. While the summary judgment motions were under advisement with Judge Erickson, Marvins successfully lobbied the Minnesota Legislature to amend Section 604.10 in a Special Legislative Session held in April 1998. This second amendment to the statute added the following clause:

(e) This section shall not be interpreted to bar tort causes of action based upon fraudulent or intentional misrepresentation or limit remedies for those actions.

Having secured this change in the law, Marvins filed their instant motion to revise the earlier orders of Judge Davis and Judge Mason in May 1998.

In retrospect, Marvins' efforts to secure a change in Section 604.10 were without legal significance to the instant case. Neither the original version of Section 604.10, nor the 1998 amended version of the statute, controls the outcome of this case. Given the fact that Judge Erickson substantially adopted Marvins' own reasoning in concluding that Section 604.10 does not retroactively apply to commercial sales predating its enactment in 1991, Marvins offer a curious set of objections on that point. Marvins newly adopted posture on the applicability of the statute is premised on three arguments: 1) that Judge Davis and Judge Mason were both aware that Section 604.10 was enacted in 1991 when they originally applied the statute in this case; 2) that until the Minnesota Legislature amended Section 604.10 in April 1998, PPG had consistently maintained the statute applies in this case; and, 3) that the Eighth Circuit applied Section 604.10 to a 1985 transaction in the case of *Regents of the University of Minnesota v. Chief Industries, Inc.*, 106 F.3d 1409, 1411 (8th Cir.1997).[4]

None of these arguments is ultimately persuasive. Although Judge Davis and Judge Mason may have been aware that Section 604.10 was enacted in 1991, the issue of the statute's retrospective applicability was not a matter of controversy in this case until Marvins first raised the issue before Judge Erickson in their opposition to PPG's instant motions for summary judgment. *See* Marvins' Mem. in Opp. to PPG's Mot. for Summ.J. at 45–47. Similarly, PPG's position with respect to the retroactivity issue is of little significance. In the R & R, Judge Erickson explicitly agrees with Marvins' argument that Section 604.10 should not be

Minnesota is set forth in the R & R, pp. 9–26.

4. The Court finds these objections curious for the reason that Marvins could only be offering them

in the hopes of persuading the Court that Judge Erickson was wrong in agreeing with Marvins' original argument on the issue.

applied to commercial sales which took place prior to 1991, thereby rejecting any argument by PPG to the contrary. *See* R & R at 50. Apparently Marvins now contend that Judge Erickson should have ruled in their favor on all of the issues except this one.

Finally, Marvins' reliance upon *Regents* is misplaced. In applying Section 604.10 to the University of Minnesota's 1985 purchase of a grain dryer, the *Regents* court construed the statute "in harmony with" the common law principles laid down in *Lloyd F. Smith, Inc. v. Den–Tal–Ez*, 491 N.W.2d 11 (Minn.1992) and *Hapka*, 458 N.W.2d at 683, and did not discuss the statute's retroactivity. *See Regents*, 106 F.3d at 1410–11. Notably, the only prior case to directly address retroactivity is an unpublished decision of the Minnesota Court of Appeals in *Dietz Bros., Inc. v. Klein Tools, Inc.*, 1993 WL 19709 (Minn.Ct. App. Jan.26, 1993). The *Dietz* court held that, because there is no language in Section 604.10 evidencing the legislature's intent to apply the statute retroactively, it was not intended to govern commercial transactions which occurred before the statute's effective date of August 1, 1991. *Id.* at 1993 WL 19709, *1; *see also* R & R at 50–55. Thus, since the transactions at issue here took place between 1985 and 1988, they are governed exclusively, if at all, by Minnesota's common law Economic Loss Doctrine.

■ Having so concluded, it is unnecessary to reach the issue of whether the 1998 Amendment unconstitutionally impairs the obligations of the preexisting sales contracts between PPG and Marvins. Courts have a "strong duty to avoid constitutional issues that need not be resolved in order to determine the rights of the parties to the case under consideration." *United States v. Turechek*, 138 F.3d 1226, 1229 (8th Cir.1998) (citation omitted). Whether viewed as a mere "clarification" of the statute, as Marvins con-

tends, or a "substantive change in the law of Minnesota," as PPG argues, the plain language of the Amendment makes it applicable only to Section 604.10 cases. The Amendment explicitly states that "[t]his section shall not be interpreted" to bar fraud or misrepresentation claims. Minn.Stat. § 604.10(d). This unambiguous statement occurs in the portion of the Amendment which amends Section 604.10, and therefore the legislature intended that the prior statute should not be interpreted to bar causes of action for fraud or misrepresentation. Having concluded that Section 604.10 does not apply to the transactions at issue in this case, the 1998 amended version of that statute likewise does not apply, and there is no need to address the issue of its constitutionality.[5] The conclusion of the R & R that the 1998 Amendment is unconstitutional is rejected as unnecessary to the holding of the case at bar.

### 3. Common Law Analysis

#### i. Was this a UCC Sale?

■ One of the important developments in the evolution of the Economic Loss Doctrine was announced in *McCarthy Well Co., Inc. v. St. Peter Creamery, Inc.*, 410 N.W.2d 312 (Minn.1987), where the court explained that the phrase "commercial transaction," as used by the court in *Superwood*, is defined as a "transaction governed by Article 2 of the UCC." *Id.* at 314. Article 2 of the UCC applies to contracts involving the sale of goods. The first question, then, when evaluating the appropriateness of the application of the Economic Loss Doctrine to the case at hand is: Did the contract between Marvins and PPG involve the sale of goods? If so, the UCC governs and economic loss is next analyzed. If not, the UCC does not govern and "there is no reason for the *Superwood* rule to apply." *Id.* at 315.

---

5. Judge Erickson reached the constitutionality issue because of the portion of the Amendment which makes it applicable "to actions pending" on the effective date of the Amendment. R & R at 55. *See* Minn.Stat. § 604.10 (1998 Amend. § 4). However, this language does not indicate that the applicability of the Amendment was intended to be greater than the applicability of the previous statute. The Court agrees with Marvins

and the State of Minnesota that the most logical interpretation of Section 4 of the Amendment is that it intends for the Amendment to be applicable "to actions pending" on the effective date of the Amendment if the statute being amended, Section 604.10, would also have applied to the action. As explained above, since Section 604.10 does not apply in this case, neither does the 1998 Amendment.

Most complex commercial transactions are not easily categorized, as many involve combinations of goods, services, or other agreements. The *McCarthy* court proposed the use of a "predominant purpose" test when evaluating whether a contract falls under the UCC. "[I]f the predominant purpose of the contract is the sale of goods, then the UCC governs; if the predominant purpose of the contract is the rendition of services, then the UCC does not govern." *Id.; see also Vesta State Bank v. Independent State Bank of Minnesota*, 518 N.W.2d 850, 854 (Minn.1994); *Jones v. Trucks of Duluth*, 1992 WL 83311, *2–3 (Minn.App.1992). The dealings between Marvins and PPG involving the sale of PILT unquestionably constituted a contract for the sale of goods. Marvins have not challenged this assertion. We agree with Judge Davis' conclusion that "[t]here is nothing in the record that indicates that this transaction was anything other than what it appears, a series of sales, by [PPG] to [Marvins], of products for use in [Marvins'] window and door manufacturing business." Order of March 17, 1995 at 11. As such, the transaction between the parties was governed by the UCC and an analysis under the common-law Economic Loss Doctrine is therefore appropriate.[6]

### ii. Are Marvins and PPG "Merchants in Goods of the Kind?"

■ Judge Erickson recommends that this Court vacate Judge Davis' ruling that Marvins are not "merchants in goods of the kind." Judge Davis did not have the benefit of the recent Eighth Circuit opinion clarifying the term in the context of Minnesota law, as *Regents*, 106 F.3d at 1411, was decided subsequent to his decision.

Marvins, seeking to define "of the kind" very narrowly, argue that, as window manufacturers, they are not experienced dealers in wood preservatives like PILT. Under their interpretation of the case law, they would not be "merchants in goods of the kind," and the Economic Loss Doctrine would not apply.

The phrase "merchants in goods of the kind" was not used in the first few Minnesota cases involving the Economic Loss Doctrine. The early cases, including *Superwood*, emphasized that the Economic Loss Doctrine should apply to dealings "arising out of commercial transactions." Instead of using the phrase "merchants in goods of the kind," the courts applied the Economic Loss Doctrine to cases involving "merchants," as defined by the UCC. None of the early holdings by the Minnesota Supreme Court on this issue limited their application to transactions between "dealers" in the goods at issue. *See Superwood*, 311 N.W.2d at 162 (applying Economic Loss Doctrine to transaction between purchaser and seller of a hot plate press); *Minneapolis Society of Fine Arts v. Parker-Klein Assoc. Architects, Inc.*, 354 N.W.2d 816 (Minn.1984) (prohibiting recovery in tort by brick purchaser against manufacturer under the Economic Loss Doctrine); *S.J. Groves and Sons Co. v. Aerospatiale Helicopter Corp.*, 374 N.W.2d 431, 435 (Minn.1985) (purchaser of helicopter had sufficient bargaining power to negotiate with manufacturer and was, thus, precluded from recovery in tort by the Economic Loss Doctrine); *Valley Farmers' Elevator v. Lindsay Brothers Co.*, 398 N.W.2d 553, 555 (Minn.1987) (Economic Loss Doctrine precludes recovery by purchaser of grain storage system against manufacturer, as both parties are "merchants" within the meaning of the UCC).

It was not until *Hapka* that the notion of "merchants in the goods of the kind" entered the equation for the doctrine's applicability. *See* 458 N.W.2d at 688 (refusing to allow the buyers of seed potatoes to recover in tort from the sellers of the potatoes because, as both parties were experienced farmers, they should have had the sophistication to negotiate reasonable warranties to deal with possible "potato rot"). The *Hapka* court reasoned that, "[I]t is at the time of the contract formation that experienced parties define the product, identify the risks, and negotiate a price of the goods that reflects the relative benefits and risks to each." *Id.* at 688. Noticeably absent from *Hapka* is any explicit

---

**6.** The conclusion that the UCC governs the Marvin/PPG contract also suggests that the code's warranty and other contract provisions (and their accompanying limitations periods) also apply. The statutory viability of these claims due to limitations concerns is discussed in section IV.C.

discussion of a narrowing of the definition of "commercial transaction." [7]

In 1992, the Minnesota Supreme Court issued its most recent analysis of the Economic Loss Doctrine in *Den–Tal–Ez*, 491 N.W.2d at 11. In discerning the common law Economic Loss Doctrine prior to the enactment of Section 604.10 (the events took place between 1977 and 1988), the court held that a dentist was entitled to recover in tort after a dental chair caused a fire which damaged other property in his dental office. The court distinguished the dentist from the farmers in *Hapka*, explaining that "[u]nlike [Hapka], who dealt in the product sold, [the dentist] does not deal in dental chairs. In the language of *Hapka*, there was not, as between the plaintiff and the defendants, a 'commercial transaction.'" *Id.* at 17. In the most sweeping aspect of the *Den–Tal–Ez* holding, the Court held that:

> [T]he UCC provides the exclusive remedy for other property damages arising out of a sale of goods only when that sale fits *Hapka*'s narrow definition of a "commercial transaction," i.e., where the parties to the sale are dealers in the same goods or, to use a more precise term, "merchants in goods of the kind." In actions for damages to other property which arise from a sale of goods between parties who are not "merchants in goods of the kind," such as in the case here, the tort remedies of negligence and strict liability are always available, even if the parties can sue under the UCC as well.

*Id.* at 17. Put more simply, the *Den–Tal–Ez* court read *Hapka* to limit the scope of the Economic Loss Doctrine to a narrow reading of "merchants in goods of the kind"—only merchants in the same goods. The court did not, however, identify any specific language in *Hapka* which supports this interpretation.

Contemporaneous to *Den–Tal–Ez*, two Minnesota Court of Appeals cases applied the Economic Loss Doctrine and prohibited commercial entities who were non-dealers

from recovering in tort for damage to other property. In *ETM Graphics, Inc. v. City of St. Paul,* 1992 WL 61394 (Minn.App.1992), the court refused to allow a painting company to recover in tort for faulty protective adhesive which resulted in damage to murals painted at the Como Park Zoo. Applying a broad definition of "merchant" as laid out in the UCC, the court explained that:

> Appellants were sophisticated purchasers of a highly specialized product, were aware of the risks associated with the purchase of an important adhesive, and conducted detailed tests of the samples provided, Respondent was not the only supplier of adhesive, and appellants could have gone to other sellers if they were unable to negotiate favorable contract terms with respondent.

*Id.* at 1992 WL 61394, *4. Following the same theme, the Minnesota Court of Appeals also held that a builder of television and radio towers *could* recover in tort against a producer and seller of specialized tools. *Dietz*, 1993 WL 19709. Analyzing whether the parties were involved in a commercial transaction, the *Dietz* court held that the plaintiff could recover in tort because he did not fall within the broad definition of "merchant" as defined by the UCC. Both *ETM Graphics* and *Dietz* applied a broader reading of the term "commercial transaction" for the purposes of the Economic Loss Doctrine than did the Minnesota Supreme Court in *Den–Tal–Ez*.

In exercising diversity jurisdiction over cases involving Minnesota law, federal courts have been forced to dissect and interpret the varying statements made by the Minnesota courts in deciphering the specifics of the Economic Loss Doctrine. In 1997, the Eighth Circuit was faced with a case involving the sale of a defective grain dryer to the University of Minnesota for use in its agricultural research station in Southwestern Minnesota. The product allegedly failed, starting a fire which caused substantial damage to University property. Interpreting the

---

7. In 1991, when the Minnesota Legislature passed Section 604.10, effectively overruling *Hapka,* they reinstated the exception for "damage to other property," and codified the common law Economic Loss Doctrine as it existed prior to

the *Hapka* case. The only relevant new feature of the statute was its use of the term "merchants in goods of the kind," rather than simply "merchants" as used in Article 2 of the UCC.

statutory language of 604.10, the court was forced to answer the question: "Is the University a 'merchant in goods of the kind' [with respect to grain dryers]?" *Regents*, 106 F.3d at 1411. Explaining that the University had purchased many such units over the years, had the advantage of a sophisticated bidding process for the units, and employed an expert to provide advice on the transaction, the court ruled that the parties were, indeed, involved in a commercial transaction (as "merchants in goods of the kind") and were thereby prohibited by the Economic Loss Doctrine from recovering in tort for damage to other property. *Id.* at 1412.

The *Regents* court distinguished the Minnesota Supreme Court's decision in *Den–Tal–Ez* in order to reach their result. The court explained,

> [w]e are not persuaded that [*Den–Tal–Ez*] requires that a "merchant in goods of the kind," for purposes of [the Economic Loss Doctrine] be an actual dealer of the product … While the court in *Den–Tal–Ez* indicated that a dealer in a commercial transaction involving its normal stock in trade was a merchant for purposes of the Economic Loss Doctrine, it did not indicate that the rule applies only to dealers. Rather, the court was more concerned with whether the plaintiff's sophistication, knowledge, and bargaining power with respect to a particular product indicates the wisdom of providing for "reasonable contaminant of the risk of a defective product … by providing for an exclusive warranty remedy." A plaintiff who regularly buys and sells goods of the kind will in all likelihood have such knowledge and sophistication, but so may a similarly knowledgeable party who is not a dealer.

*Id.* at 1412 (*citing Den–Tal–Ez*, 491 N.W.2d at 16). In so holding, the court applied the broad themes embodied in the UCC term "merchant" (product knowledge and experience, sophistication, and equality of bargaining power) as the test in Minnesota for labeling a sale to be a "commercial transaction" in the context of the Economic Loss Doctrine. Judge Beam explained: "[t]o be sure, not all large, sophisticated purchasers are merchants in goods of the kind they buy, just as

an informed and careful individual consumer does not become a 'merchant.' But based on the particular and undisputed facts of this case, we agree with the district court that the University possessed specialized knowledge with respect to the grain drying unit … [and] was a merchant in goods of the kind and [the Economic Loss Doctrine] bars any recovery in tort." *Id.*

Judge Lay, dissenting in *Regents*, disagreed with the majority's reading of Minnesota law. He suggested that the Minnesota Supreme Court in *Den–Tal–Ez* manifested a clear intent to limit the common law interpretation of "merchant in goods of the kind" strictly to "dealers" in common products. *Id.* at 1413. His dissent strongly urged that "something more than engaging a specialist is necessary to move the University within the scope of 'merchant in goods of the kind.'" *Regents*, 106 F.3d at 1415.

Subsequent to the *Regents* decision, the Minnesota Court of Appeals in *Jennie–O Foods, Inc. v. Safe–Glo Products*, 582 N.W.2d 576 (Minn.Ct.App.1998) briefly examined the Economic Loss Doctrine as it applied to a turkey farm suing the producer of a heat lamp which caused fires destroying two barns. Adopting the rationale of Judge Lay's dissent in *Regents*, the court ruled that Jennie–O was not a "merchant in goods of the kind" with respect to heaters and was not barred from recovery in tort. Applying Section 604.10, the court reasoned that the legislature specifically chose to use the more limited phrase in the statute, rather than the more general term "merchant" as defined in the UCC.

Since the Eighth Circuit's decision in *Regents*, the Minnesota Supreme Court has not written on the issue to provide guidance as to the future direction of the Economic Loss Doctrine. As illustrated by the litany of cases described above, the distinction between commercial and consumer transactions, hinging on the scope of the phrase "merchants in goods of the kind," remains relatively unclear.

A step back from the microscopic analysis of individual cases and a look at the big picture of the logic underlying the development of the case law aids the analysis. At

the heart of the common law as it stood prior to the enactment of Section 604.10 was the following important principle: The purpose of the Economic Loss Doctrine is to ensure that the UCC serves as the exclusive remedy for sophisticated commercial parties when negotiating commercial contracts. A reading of the early case law on the Economic Loss Doctrine reflects such a principle. *See Superwood,* 311 N.W.2d at 162; *Minneapolis Society of Fine Arts,* 354 N.W.2d at 820–21; *S.J. Groves,* 374 N.W.2d at 434–35; *Valley Farmers' Elevator,* 398 N.W.2d at 555. To that end, the Court agrees with the rationale of the *Regents* decision and Judge Erickson's recommendation, that the doctrine (at least under the common law) should not be limited to dealers. Marvins possessed specialized knowledge of both wood preservatives in general, and of PILT in particular, and, in the language of *Regents,* "this knowledge informed [Marvins] of the risks posed by the product and the potential damage to both the product and other property that could result from product failure." *Regents,* 106 F.3d at 1412.

Marvins argue that the Court of Appeals decision in *Jennie–O* should control this case. While the *Jennie–O* court purports to adopt the standard set out in Judge Lay's dissent in *Regents,* the Minnesota Supreme Court would come to a different conclusion if presented with the facts of this case. Marvins' purchase of PILT is of a different ilk than Jennie–O's purchase of a heating lamp. The relationship between a manufacturer of wood framed windows and a wood preservative dealer is of an entirely different character than one between a turkey grower and heat lamp dealer. When a window manufacturer purchases and applies a wood preservative to its window frames, the substance becomes inextricably linked with the manufacturer's product. On the other hand, while the heat lamp might be essential to the grower, it does not become a part of the turkey.

Based on the underlying principles of the Economic Loss Doctrine as emphasized in the common law, a multi-million dollar window company with a long history of dealing with window coatings is the type of party whose remedies should be limited to those found in the UCC when dealing with another large, sophisticated party. The parties' equality of bargaining power, Marvins' long history of purchasing window treatments, the companies' representation on the Treatment and Coatings Committee of the National Wood Windows and Doors Association ("NWWDA"), and other factors lead to the inevitable conclusion that Marvins are "merchants in goods of the kind" for the purposes of the Economic Loss Doctrine.

Marvins satisfy the test for "merchants in goods of the kind" and are barred from pursuing common law tort claims. Accordingly, PPG's motion for summary judgment on Marvins' negligence and strict liability claims must be granted in its entirety. In addition, PPG's motion for summary judgment on Count VII of the Amended Complaint is granted, to the extent that the count does not state a claim for fraud which is collateral to Marvins' UCC claims.

iii. Are any of Marvins' Claims "Outside of" of or "Collateral to" to the Contract?

■ The next operative question therefore becomes: Do Marvins state a claim for common law fraud and misrepresentation which is independent of their UCC contract claims? Such a claim for fraud would fall beyond the limitations of the Economic Loss Doctrine. *See AKA Distributing Co. v. Whirlpool Corp.,* 137 F.3d 1083, 1086 (8th Cir.1998).

As observed in the R & R, "[w]hile the standard is easy to articulate, it is more difficult to apply, particularly where, as here, we are presented with not an isolated Article 2 sales contract, but with a series of successive contracts which span a period of several years." R & R at 82. The alleged acts of fraud perpetrated by PPG can be summarized in three general categories:

(1) PPG's statements regarding the efficacy and capabilities of PILT;

(2) PPG's assurances that the company would "stand behind" the product, should it prove to be defective; and,

(3) PPG's efforts to sell itself as an expert in the manufacture of wood preservatives.[8]

The viability of any of Marvins' fraud claims is dependent on whether the claim is "based upon a misrepresentation that was outside of or collateral to the contract." *AKA Dist.*, 137 F.3d at 1086. Marvins argue that many of the statements made by PPG were of a more global nature (i.e. regarding the company's good will and trustworthiness) and, consequently, were outside the scope of the immediate contract. This argument is flawed and ultimately unpersuasive.

The UCC provision which governs express warranties is codified, providing that:

(1) Express warranties by the seller are created as follows:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the description.

\*    \*    \*    \*    \*    \*

(2) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.

Minn.Stat. § 336.2–313. An item by item review of the record shows that each fraud allegation involves a matter closely tied to the PILT sales contracts between Marvins and PPG. *See* R & R at 82–91. Legally, any

statement related to the performance of PILT falls squarely within the domain of the UCC warranty provision.[9] Minnesota law holds that, once made, an express warranty as to the quality or nature of a good becomes a part of the contract for the sale of the good itself. *See, e.g., McNaughton v. Wahl,* 99 Minn. 92, 108 N.W. 467, 468 (1906). Each of the allegedly fraudulent statements made by PPG was part of the contract itself, and recovery in tort is clearly barred by the Economic Loss Doctrine.

iv. Does the Economic Loss Doctrine Prohibit Recovery for Fraud or Misrepresentation?

■ Marvins argue that the Minnesota Economic Loss Doctrine does not bar fraud and misrepresentation claims at all. Relying on the Minnesota Supreme Court language in *Superwood* that "economic losses arising out of commercial transactions are [not] recoverable under *negligence* and *strict products liability* theories," they argue the Economic Loss Doctrine is irrelevant and their fraud claims should survive summary judgment. *Superwood,* 311 N.W.2d at 160–62 *(emphasis added )*. A review of the case law, however, demonstrates that such a contention is misplaced.

Marvins' reading of the *Superwood* case is contorted. Two paragraphs prior to the statement supposedly "limiting" recovery to strict liability and negligence, the court describes the danger of allowing a commercial party to recover in "tort theories." *See Superwood,* 311 N.W.2d at 162. The court did not make any effort to distinguish one type of tort theory from another for the purposes of the Economic Loss Doctrine. At the very least, the issue was not specifically addressed in *Superwood* or any other Minnesota Supreme Court cases construing common law.

---

8. The specific statements in each category are specifically identified in the record and cited in the R & R. *See* R & R at 873–74.

9. Any claims of alleged "fraudulent inducement" also fall within the purview of the contract itself. Such claims are too closely related to the four corners of the original agreement. *See* R & R at 82–91; *see also Huron Tool and Engineering Co.*

*v. Precision Consulting Services, Inc.*, 209 Mich. App. 365, 532 N.W.2d 541, 545 (Mich.App.1995) ("Where the only misrepresentation by the dishonest party concerns the quality or character of the goods sold, the other party is still free to negotiate warranty and other terms to account for possible defects in the goods").

Marvins argue that the Minnesota Supreme Court decisions in *Vesta*, 518 N.W.2d at 854 and *Buller v. A.O. Smith Harvestore Prods., Inc.*, 518 N.W.2d 537, 538–40 (Minn. 1994) permit parties to pursue claims for fraud arising out of transactions in goods. Again, reliance on each case is misplaced. *Vesta* is distinguishable because it deals not with independent fraud claims, but rather fraud claims arising directly out of the UCC. *See Vesta*, 518 N.W.2d at 854–55. The Economic Loss Doctrine does not serve as an *outright* prohibition of fraud claims. It merely holds that the remedies available for commercial transactions gone awry are limited to those under the code. The UCC specifically provides for certain remedies for fraud within the code itself. In the case at hand, however, the expiration of the statute of limitations forces Marvins to pursue common law fraud claims outside the UCC. While the Court in *Buller* implicitly accepts an independent fraud action which the trial judge allowed to remain, the question was not raised by either party in the case. Consequently, the Court does not directly analyze the claim fraud in light of the Economic Loss Doctrine. *See Buller*, 518 N.W.2d at 540–42.

Decisions by the Minnesota Court of Appeals and this Court, exercising the predictive function in diversity cases, have answered the question in the affirmative, broadly stating that the Minnesota Economic Loss Doctrine does bar claims of fraud and misrepresentation that are within the scope of the contract. *See ETM Graphics*, 1992 WL 61394; *In re Grain Land Coop Cases*, 978 F.Supp. 1267 (D.Minn.1997); *Upsher–Smith Labs. v. Mylan Labs.*, 944 F.Supp. 1411 (D.Minn.1996); *Nelson Distributing, Inc. v. Stewart–Warner Indust. Balancers*, 808 F.Supp. 684 (D.Minn.1992). In *ETM Graphics*, the Minnesota Court of Appeals applied the Economic Loss Doctrine to bar a fraud claim by the purchaser of a paint adhesive against the seller and manufacturer of the product. The court reasoned that "in order for the parties to be able to depend with certainty on the exclusivity of the remedies provided by the [UCC], appellants' claims for damages must be limited to those provided by the UCC." *Id.* at *2. The court

read the Economic Loss Doctrine prohibition against tort remedies to include fraud and misrepresentation.

The Eighth Circuit has applied the same logic as the *ETM Graphics* court. In evaluating a fraud claim by a vacuum cleaner distributer against the manufacturer, Judge Loken explained: "We think the Minnesota Supreme Court would resolve the legal issue in this case by holding that, in a suit between merchants, a fraud claim to recover economic losses must be independent of the Article 2 contract or it is precluded by the Economic Loss Doctrine." *AKA Dist.*, 137 F.3d at 1087. Judge Loken reasoned that the principles of the Economic Loss Doctrine and the primacy of the UCC in governing commercial transactions demand that only fraud claims which lie "outside of or collateral to the contract" can remain viable. *Id.* at 1086. As discussed earlier, each of the fraud claims alleged by Marvins is so closely related to the subject matter of the various Article 2 sales contracts that they may not be pursued.

During oral argument, Marvins suggested that the Eighth Circuit's recent decision in *Hawkins Chemical, Inc. v. Westchester Fire Ins. Co.*, 159 F.3d 348 (8th Cir.1998) should undercut our reliance on federal predictive law, requiring us to "follow state court precedent and legislative precedent, if it's inconsistent with federal law." Transcript of 10/30/98 Oral Argument at 4. *Hawkins* is inapplicable to this analysis. In *Hawkins*, the Eighth Circuit did acknowledge that federal courts are bound to follow subsequent state law, but the court actually read the new state court cases to co-exist with the initial federal predictive law. This is similar to the Court's approach here. There are a number of Minnesota cases, particularly *Superwood* and its progeny, which support the holdings of federal predictive cases like *Regents*. As discussed earlier, the incarnations of the statutory doctrine in Section 604.10 are immaterial to this analysis.

The predictive law of the Eighth Circuit, read in tandem with the decision of the Minnesota Courts of Appeals and the likely future course of the Minnesota Supreme Court, supports a conclusion that the Minne-

sota Economic Loss Doctrine does not treat fraud differently than other tort theories when alleged in connection with an Article 2 contract. Judge Erickson's R & R is accepted and Marvins' Motion to Revise is denied.[10]

## B. Certification

■ Marvins argue that Minnesota law does not clearly state whether fraud and misrepresentation are included in the limitations of the Economic Loss Doctrine. They point to the seemingly contrary holdings in *Jones* and *ETM* as "evidence" that the Minnesota Courts are "split" on the issue. *See Jones*, 1992 WL 83311 at *1; *ETM*, 1992 WL 61394 at *1–2. Similarly, they argue that the Minnesota Supreme Court's use of "strict liability and negligence" on various occasions indicates a desire to omit the "unique" torts of fraud and misrepresentation from the Economic Loss Doctrine's prohibitions. *See e.g., Den–Tal–Ez*, 491 N.W.2d at 16. To resolve this division, Marvins ask this court to exercise its discretionary power to "certify" the following question of law to the Minnesota Supreme Court:

> Does the Minnesota Economic Loss Doctrine bar or in any other way limit a party's right to pursue causes of action and remedies for common law fraud and misrepresentation?

Marvins' Mem. in Supp. of Mot. to Certify at 9. Certification is within this Court's jurisdiction, pursuant to Minn.Stat. Section 480.065 *et seq.*

The United States Supreme Court has held that certification may be appropriate when there is a novel or unsettled question of state law and the federal court is unable to adequately discern or predict the appropriate legal conclusion. In any case, the decision always lies entirely within the discretion of the trial court. *See Lehman Brothers v. Schein*, 416 U.S. 386, 391, 94 S.Ct. 1741, 40 L.Ed.2d 215 (1974). For the following reasons, the Court denies Marvins' motion.

### 1. *This is Not a Novel Question, nor is Minnesota Law Completely Unsettled*

Minnesota courts have provided ample case law setting out the principles underlying the Economic Loss Doctrine. Cases like *S.J. Groves*, 374 N.W.2d at 434, *Hapka*, 458 N.W.2d at 687, and *Minneapolis Society of Fine Arts*, 354 N.W.2d at 819, have echoed the important principle that, to allow a sophisticated party to a commercial transaction to recover in tort *outside of* the remedies provided in the UCC would emasculate the primacy of the code and overturn the certainty and predictability which must accompany a commercial contract. In addition, the first description of the Economic Loss Doctrine in *Superwood* referred generally to a bar on *tort* claims, without any limitations or qualifiers.[11] With this underlying case law in mind, the Eighth Circuit in *AKA Dist.*, 137 F.3d at 1087, answered the precise question Marvins seek to certify. While admitting that the specific issue of fraud had not been directly decided by the Minnesota Supreme Court, the *AKA Dist.* court evaluated Minnesota precedent which had "broadly discussed

---

**10.** Marvins point to *Jones*, 1992 WL 83311, in support of their objection to the finding that fraud and misrepresentation *are* prohibited by the Economic Loss Doctrine. They argue that the case "held the Economic Loss Doctrine, as set forth in *Superwood*, and section 2–721 of the UCC, *does not bar* fraud and misrepresentation claims." Marvins' Objections at 6 (emphasis in original). This statement is both incorrect and misleading. While the *Jones* case did discuss fraud and the Economic Loss Doctrine in the same breath, the Minnesota Court of Appeals allowed a fraud claim to go forward *under the UCC*, and not as an independent tort claim. The court refused to allow a warranty disclaimer in the contract at issue to prohibit the buyer from bringing a fraud suit under the UCC section 2–721. Such a disclaimer would distort Minnesota law, specifically the statutory provisions of the

UCC. The case does not support the argument that an independent fraud claim, brought outside of the UCC, is exempt from the Economic Loss Doctrine.

**11.** The Court stated: "The recognition of *tort* actions in the instant case would create a theory of redress not envisioned by the legislature when it enacted the UCC. Furthermore, *tort* theories of recovery would be totally unrestrained by legislative liability limitations, warranty disclaimers and notice provisions. To allow *tort* liability in commercial transactions would totally emasculate these provisions of the UCC. Clearly the legislature did not intend for *tort* law to circumvent the statutory scheme of the UCC." *Superwood*, 311 N.W.2d at 162 (emphasis added).

whether 'tort liability in commercial transactions' should be allowed." *Id.* at 1086. The court felt it was well-equipped to make an adequate determination that fraud claims are, indeed, barred by the Economic Loss Doctrine. In answering the question in this case, the Court adopts the rationale of many federal courts which have encountered the issue and arrives at a conclusion without the time-consuming and unnecessary exercise of certification. *See In re Grain Land Coop,* 978 F.Supp. at 1279; *Upsher–Smith,* 944 F.Supp. at 1435; *Nelson Dist.,* 808 F.Supp. at 686–88. Both history of Minnesota case law and prior analysis by the Eighth Circuit lead to a definite conclusion that the Minnesota Economic Loss Doctrine bars a separate action for fraud and misrepresentation. *See Shakopee Mdewakanton Sioux Community v. City of Prior Lake,* 771 F.2d 1153, 1156 (8th Cir.1985) ("Absent a close question and lack of state sources enabling a nonconjectural determination, a federal court should not avoid its responsibility to determine all issues before it. Indeed, the probable delay caused by the certification process would outweigh any benefit the state court's response could provide").

### 2. *Marvins' Request Amounts To Belated Forum Shopping*

■ Marvins' request is not only legally unnecessary, it is also untimely, arriving at well nigh the eleventh hour. This is far from the first time in the four years of litigation of this case that the question of fraud under the economic loss doctrine has arisen. In fact, this is the fourth time that a judge has been faced with the issue in the instant action. Only now, after Marvins have received consistently adverse rulings on the subject, do they craftily urge the Court to avail itself of the certification procedure.

Certification is not a procedure to be invoked simply because a party is unhappy with the ruling of a federal court. The Eighth Circuit has directly stated, "[t]he process of requesting certification after an adverse judgment has been entered should be discouraged ... Once a question is submitted for decision in the district court, the parties should be bound by the outcome unless other grounds for reversal are present." *Perkins v. Clark Equipment Co.,* 823 F.2d 207, 209–10 (8th Cir.1987). In the case at hand, Marvins have not demonstrated that the question is truly an unclear one in Minnesota. Their election to argue the issue to judgment on multiple occasions makes certification even less appropriate. Most significantly, Marvins' initial decision to choose the federal forum further undermines their asserted "desire" to have the state court entertain the issue. *See Jefferson v. Lead Indus. Assoc., Inc.,* 106 F.3d 1245, 1248 (5th Cir.1997); *Cantwell v. University of Massachusetts,* 551 F.2d 879, 880 (1st Cir.1977). Marvins' Motion for Certification is, therefore, denied.

### C. Tolling of Marvins' UCC Claims

Alternative to the tort theories of recovery, Marvins argue two independent reasons for tolling the statute of limitations on their UCC claims: First, an express warranty of future performance serves to extend the accrual date for their UCC claims. Second, they contend that alleged fraudulent concealment by PPG tolled the statute of limitations and extended the time frame for the viability of their contract claims.

### 1. *Warranty of Future Performance*

■ Marvins argue that two conversations between PPG sales representative Bob Panchot ("Panchot") and William and Jake Marvin in 1984 constitute an explicit warranty of future performance for PILT. In a very belated refreshed recollection disclosed near the discovery deadline, Bill Marvin now recalls the following fourteen-year-old conversation: "[Panchot] said ... [O]ur PILT product ... has been developed over years, we have the research back in our labs, and if we put that on, you're assured that the finish coat is almost a lifetime finish. [Bill Marvin] said, how could you improve on that? [Panchot] said, trust me, Bill." Aff. of Steven C. Tourek (Jan. 5, 1998), Ex. 35A at 57–58. Similarly, Marvins' other principal, Jake Marvin recalls Panchot as stating: "Bill, [PILT] will outlast that Penta. It will outlast the windows that you have in your home at 26 years. It's a better product." *Id.* at Ex. 35B, at 42–43. Marvins argue that these

representations, as well as references in the record to the life-expectancy of Penta, serve as express warranties of future performance which would be actionable under the UCC.

Minnesota statutory law states that, "where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered." Minn.Stat. § 336.2–725(2). The existence of a warranty of future performance in this case hinges on the definition of the term "explicitly." Were PPG's alleged representations that PILT would last "at least 26 years" or that it would "outlast Penta" explicit enough to constitute a sufficient warranty? Most detrimental to Marvins' case is the factual inability to point to a more express warranty provision in any of their sales contracts which would provide evidence of such a warranty. The Eighth Circuit has held that, for a warranty of future performance to be effective and enforceable, "the terms of the warranty must unambiguously indicate that the manufacturer is warranting the future performance of the goods for a specified period of time." *R.W. Murray Co. v. Shatterproof Glass Corp.*, 697 F.2d 818, 823 (8th Cir.1983); *Economy Housing Co., Inc. v. Continental Forest Prod., Inc.*, 805 F.2d 319, 321 (8th Cir.1986). Although no Minnesota cases appear to be directly on point, a number of Minnesota cases suggest a similar need for an explicit length of warranty. *See Church of Nativity of Our Lord v. WatPro, Inc.*, 491 N.W.2d 1 (Minn.1992) (express warranty for ten years); *Anderson v. Crestliner, Inc.*, 564 N.W.2d 218, 220 (Minn.Ct.App.1997) (exactly five years); *Metropolitan Life Ins. Co. v. M.A. Mortenson Co., Inc.*, 545 N.W.2d 394, 401 (Minn. App.1996) (ten years). As application of the

standard articulated by the Eighth Circuit results in a finding that PPG did not offer Marvins an express warranty sufficiently *explicit* enough to provide them with a cause of action, Judge Erickson concluded the following: "[s]uch an imprecise benchmark cannot plausibly be characterized as a 'defined period of time in the future.'" R & R at 109–10 (*citing Economy Housing*, 805 F.2d at 321). Marvins may not rely on any warranty of future performance to extend the accrual date of their UCC causes of action.

### 2. *Fraudulent Concealment*[12]

▪ Marvins argue that PPG engaged in "fraudulent concealment" of the alleged defects in its PILT product, by concealing, *inter alia*, (1) the fact that PILT was not NWWDA certified; (2) the fact that PPG had not engaged in long-term field testing of PILT; (3) the fact that the formula PPG sold to Marvins was different than that sold to Andersen Windows; (4) the true reasons for PILT's "gel-kickout" problem; and (5) the defective nature of PILT when Marvins approached the company with complaints in 1990 and 1992–93. *See* R & R at 113. This court finds, as did Judge Erickson, that none of Marvins' claims support an action for fraudulent concealment.

▪ Fraudulent concealment of a product's defect by the manufacturer or seller "tolls the statute of limitations until the party discovers, or has a reasonable opportunity to discover, the concealed defect." *Hydra–Mac, Inc. v. Onan Corp.*, 450 N.W.2d 913, 918 (Minn.1990). In order to toll the statute, a plaintiff must do more than merely establish that the defendant has concealed the defect. The plaintiff must also show that it was personally unaware that the defect existed. *Id.* at 919. Further, the plaintiff must establish that the defendant engaged in

---

12. This discussion is limited to fraudulent concealment as a tolling mechanism. Marvins also object to Judge Erickson's agreement with the Court's dismissal of Marvins' Count XIII of the First Amended Complaint pleading fraudulent concealment as an independent cause of action. *See* Order of March 17, 1995; R & R at 97, n. 28 ("[W]e have discovered no case authority which suggests that 'fraudulent concealment' exists as an independent cause of action in Minnesota"). Despite Marvins' argument to the contrary, *In re*

*TMJ Implants Prods. Liability Lit.*, 880 F.Supp. 1311, 1316 (D.Minn.1995) does not support such a claim. While Judge Magnuson appears to allow such a claim in the case, there is no direct discussion as to whether Minnesota law is the source of the claim. Furthermore, even if Marvins were able to plead the issue as an independent claim, the same reasons fraudulent concealment fails as a tolling shield would prohibit its use as an affirmative sword.

some conduct of an affirmative nature designed to prevent the plaintiff from becoming aware of the defect. *See Klehr v. A.O. Smith Corp.*, 87 F.3d 231, 237 (8th Cir.1996); *see also Appletree Square 1 Limited Partnership v. W.R. Grace & Co.*, 815 F.Supp. 1266, 1275 (D.Minn.1993), *aff'd*, 29 F.3d 1283 (8th Cir. 1994). Another important aspect of fraudulent concealment is that "[i]n no case, is mere silence or failure to disclose sufficient in itself to constitute fraudulent concealment." *Id.* While the facts surrounding fraudulent concealment for the purposes of a tolling question are sometimes considered questions of fact, "[w]here the evidence leaves no room for a reasonable difference of opinion ... the court may properly resolve fact issues as a matter of law." *Veldhuizen v. A.O. Smith Corp.*, 839 F.Supp. 669, 675 (D.Minn.1993).

Fraudulent concealment cannot exist if a plaintiff has knowledge of the evidence of an alleged defect. *See Hydra–Mac*, 450 N.W.2d at 919. Marvins received multiple complaints from customers regarding the alleged rot problem long before the statute of limitations had run. These complaints served as notice to Marvins of the existence of a potential defect in PILT. PPG had no access to these complaints to conceal them even if they sought such concealment. Similarly, the other alleged problems with PILT (NWWDA certification problems, water repellency test failure, the presence of kick out in Marvins' tanks), were well known to Marvins long before the statute of limitations expired. In addition, the bulk of Marvins' claims center around PPG's failure to disclose information about PILT. Such conduct amounts only to "silence" in the face of negative information. As *Klehr v. A.O. Smith Corp.*, 87 F.3d at 237, dictates, such silence does not rise to the affirmative act necessary for fraudulent concealment.

In their objections, Marvins now attempt to bolster their fraudulent concealment theory by arguing additional statements and acts by PPG. None of these meets the requisite legal standard. For example:

(1) PPG's alleged failure to disclose independent laboratory reports regarding failure of the swellometer test; *see* Tourek Aff.Ex. 75A–E;

On this charge we agree with Judge Erickson's conclusion that this omission is merely silence in the face of negative information— not an affirmative act of concealment;

(2) PPG's "incomplete" disclosure of swellometer test results; *see* Tourek Aff.Ex. 76A, 75E;

The production of partially accurate information, merely because it is not comprehensive, does not require tolling of the statute of limitations;

(3) PPG's alleged concealment of failed swellometer test results to the Court during PPG chemist Roger Harlan's testimony in 1997; *see* Harlan Aff.;

While the Court obviously feels disdain for evasive or misleading testimony by affiants, the substantive nature of Harlan's testimony—rendered after Marvins became aware of the cause of action (litigation was well underway)—is not proper evidence in support of a tolling argument; and,

(4) the allegation that PPG provided Marvins with a different version of the PILT formula in order to provide the company with incorrect swellometer results during their internal testing;

While such an allegation has the capability to become the affirmative act necessary for fraudulent concealment, there is no direct evidence adduced to support such a charge. In fact, the two documents cited by Marvins in support of this allegation, Harlan's July 17, 1984 letter to Terry Peterson, and Marvins' own internal documents chronicling the testing of PILT, show only that the test results garnered by both parties may have been slightly different. *See* Blofield Aff. at Ex. 2; Heyring Aff. at Ex. 21. An examination of the voluminous record exposes no "smoking gun" which would show a concerted effort by PPG to play "switcheroo" with the formula in order to conceal a defect in PILT.

An analysis of each of the alleged acts of deception fails to lend any support to fraudulent concealment of a cause of action by PPG while Marvins were attempting to determine the cause of premature rotting of their windows and doors. While PPG's silence in the face of poor performance tests or unwillingness to provide documentary evidence of

such failures may "cast a dark shadow over past conduct of [PPG]," we agree with Judge Erickson's conclusion that the alleged acts do not create a genuine issue of fact on fraudulent concealment. *See* R & R *(citing Metropolitan Federal Bank of Iowa, F.S.B. v. W.R. Grace & Co.,* 793 F.Supp. 205, 208 (D.Minn. 1992), *aff'd* 999 F.2d 1257 (8th Cir.1993)). There is no fraudulent concealment evidence sufficient to toll the statute of limitations on the UCC claims.

## D. Statutory Fraud and Consumer Protection Statutes

■ Marvins' Tennessee statutory fraud claims (Counts XI–XIII) are limited under Tenn.Stat. § 47–18–110 to a four-year statute of repose. Marvins concede that their claims are facially untimely, but argue that PPG's fraudulent concealment also tolled the statute of limitations in Tennessee. As explained above, Marvins have failed to present sufficient evidence to show fraudulent concealment by PPG. Accordingly, Marvins' Tennessee statutory claims are dismissed as time-barred.

■ Additionally, as Judge Erickson found, Marvins lack proper standing to proceed with their consumer fraud claims under Minn.Stat. §§ 325D.13, 325F.67, and 325F.69 (Counts VIII–X). The Minnesota Supreme Court's opinion in *Church of Nativity,* 491 N.W.2d at 1, limits recovery under the Minnesota Consumer Fraud Act, Minn.Stat. § 325F.69, to those parties who are not "merchants" as that term is defined in the U.C.C. 491 N.W.2d at 7–8 (citing Minn.Stat. § 336.2–104). As explained above, Marvins fall squarely within the definition of "merchant."

Furthermore, applying the *Church of Nativity* reasoning to bar Marvins' claims under the Minnesota Unlawful Trade Practices Act, Minn.Stat. § 325D.13, and False Statement in Advertising Act, Minn.Stat. § 325F.67, is a natural outgrowth of the Economic Loss Doctrine. To hold otherwise would bury the U.C.C. in statutory consumer tort actions and seriously undermine the predictability it provides to companies transacting business in Minnesota. The *Church of Nativity* court recognized as much by evaluating whether the plaintiff church was a "merchant" before proceeding to analyze the merits of its consumer claims. 491 N.W.2d at 7–8. Because Marvins is not a "consumer," but rather a large, sophisticated business with a wealth of experience in wood preservatives, it does not have standing to pursue its claims under the Minnesota consumer protection statutes.

## E. PPG's Motion to Dismiss Marvins' Damage Claims

Because PPG's Motion to Dismiss Marvins' Legal Claims is granted, their Motion to Dismiss Marvins' Damage Claims is denied, as moot.

## V. CONCLUSION

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS SO ORDERED** that:

1. Magistrate Judge Raymond L. Erickson's August 6, 1998 Report and Recommendation is **ADOPTED IN PART AND MODIFIED IN PART;**

2. Plaintiffs' Motion to Revise Earlier Orders Pursuant to Federal Rule of Civil Procedure 54(b) so as to reinsert their common law fraud claims [Docket No. 431] is **DENIED;**

3. Defendant's Motion for Summary Judgment on Plaintiffs' Legal Claims [Docket No. 372] is **GRANTED;**

4. Defendant's Motion for Summary Judgment on Plaintiffs' Damages Claims [Docket No. 375] is **DENIED AS MOOT;**

5. Plaintiffs' Request for Certification to the Minnesota Supreme Court [Docket No. 506] is **DENIED;** and,

6. Plaintiffs' claims are **DISMISSED WITH PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**