# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-1424

_____

| | | |
|---|---|---|
| Marvin Lumber and Cedar Company;<br>Marvin Windows of Tennessee, Inc., | * <br> * <br> * | |
| Plaintiffs - Appellants, | * <br> * | |
| v. | * <br> * | |
| PPG Industries, Inc., | * <br> * | |
| Defendant Third Party<br>Plaintiff - Appellee, | * <br> * <br> * | Appeal from the United States<br>District Court for the<br>District of Minnesota. |
| v. | * <br> * | |
| Elf Atochem North America, Inc., | * <br> * | |
| Third Party Defendant.<br>----------------------------- | * <br> * | |
| Minnesota, | * <br> * | |
| Amicus on Behalf<br>of Appellant. | * <br> * | |

_____

Submitted: November 15, 1999
Filed: August 22, 2000

_____

Before WOLLMAN, Chief Judge, LAY and BOWMAN, Circuit Judges.

_____

BOWMAN, Circuit Judge.

Marvin Lumber and Cedar Co. and Marvin Windows of Tennessee, Inc. (collectively "Marvin") filed a multicount suit against PPG Industries, Inc. ("PPG"). The District Court dismissed several counts and granted summary judgment in favor of PPG on the rest. Marvin appeals, and we affirm in part and reverse in part.

I.

The Marvin companies are Minnesota and Tennessee corporations that manufacture and sell custom-made wooden doors, windows, and other construction products. PPG makes and sells, among other things, wood preservatives, primers, and coatings. The dispute here arose from Marvin's purchase of wood preservatives from PPG for Marvin's use in treating its windows and doors.

For several decades, Marvin treated its wood products with a preservative containing pentachlorophenol, called Penta for short, which is effective in preventing premature wood rot and decay caused by moisture penetration. Penta had drawbacks, including toxicity, and starting in the late 1970s, alternative wood treatments began to emerge. PPG makes such a treatment called "PILT," which stands for "preservative in line treatment."

Marvin purchased and used PPG's PILT from 1985 to 1988, along with other PPG products such as primers and topcoats. On April 22, 1994, Marvin filed this suit. The complaint asserts numerous legal theories, but, ultimately, the central allegation is that PPG's products did not meet Marvin's expectations in preventing wood rot and deterioration in Marvin's doors and windows. Specifically, there are thirteen legal theories in the Amended Complaint: (I) contract; (II) express warranty; (III) implied warranty of merchantability; (IV) implied warranty of fitness for a particular purpose;

(V) negligence; (VI) strict liability; (VII) fraud and misrepresentation; (VII-XII) violations of several state antifraud statutes; and (XIII) fraudulent concealment.

The procedural background of the case is somewhat complicated. We recite only that necessary for our purposes here. On March 17, 1995, the District Court dismissed Marvin's statutory fraud claims, without prejudice, as having been pled with insufficient particularity. The same decision also dismissed Marvin's tort claims, including those sounding in common-law fraud, insofar as they related to damage to the goods sold by Marvin, based on Minnesota's economic loss doctrine. Marvin filed another complaint and on October 13, 1995, a Magistrate Judge issued a Report and Recommendation suggesting that the common-law and statutory fraud claims in the Amended Complaint be dismissed, and the District Court so ordered on October 31, 1995. Marvin then sought and obtained a statutory change from the Minnesota legislature. Relying on this change, Marvin asked the District Court to revise its earlier decisions. Another Report and Recommendation, dated August 6, 1998, suggested denial of such revision and also, on PPG's motions, recommended summary judgment against Marvin on the remaining claims. The District Court adopted the Magistrate Judge's recommendations and entered judgment for PPG on January 15, 1999, although it did not adopt the reasoning of the Report and Recommendation in its entirety. See Marvin Lumber & Cedar Co. v. PPG Indus., Inc., 34 F. Supp. 2d 738 (D. Minn. 1999). Seeking reinstatement of its claims, Marvin has timely appealed.

There are three central issues in this appeal. First, we must decide whether Marvin's contract claims are barred by the governing statute of limitations. Second, we must decide whether Minnesota's economic loss doctrine bars Marvin's tort claims. Finally, we decide whether Marvin is protected by the state statutes on which it bases its statutory fraud claims.

As a diversity action, this case is governed by state substantive law. See Erie R.R. v. Tompkins, 304 U.S. 64, 78 (1938). Where the state law is uncertain, our task

is to predict how the state supreme court would resolve the issue if faced with it. See Jackson v. Anchor Packing Co., 994 F.2d 1295, 1301 (8th Cir. 1993). Except for the causes of action based on Tennessee statutes, the District Court applied Minnesota law and the parties do not argue for the application of any other. Here, we review all of the District Court's determinations de novo, considering all evidence in the light most favorable to Marvin on summary judgment issues and, with regard to the Rule 12 dismissals, accepting the complaint's factual allegations as true and construing them in the light most favorable to the plaintiff. See Anderson v. Franklin County, Mo., 192 F.3d 1125, 1131 (8th Cir. 1999).

II.

The Uniform Commercial Code (U.C.C.), adopted in Minnesota, establishes that Article 2 contract claims must be brought within four years of their accrual. See Minn. Stat. § 336.2-725(1) (1998). Ordinary warranty claims generally accrue upon tender of delivery. See id. § 336.2-725(2). Marvin last took delivery of PPG's product in December 1988 and failed to file suit until April 1994, almost two years too late. Two circumstances might allow the claims as timely: if PPG fraudulently concealed its breach from Marvin or if PPG expressly warranted the future performance of its products. We believe there is a jury question as to the existence of a future performance warranty.

A.

Marvin alleges that PPG fraudulently concealed the PILT defects forming the basis of Marvin's causes of action, which would toll the statute of limitations until Marvin discovered or had a reasonable opportunity to discover the concealed defects. See Hydra-Mac, Inc. v. Onan Corp., 450 N.W.2d 913, 918 (Minn. 1990). To prevail, Marvin must show that PPG fraudulently concealed "the very existence of the facts which establish the cause of action" and that Marvin was "actually unaware" of these

-4-

facts. Id. at 918-19. Since these are disputes of fact, summary judgment is appropriate only where a reasonable juror could not find fraudulent concealment. See Miles v. A.O. Smith Harvestore Prods., Inc., 992 F.2d 813, 817 (8th Cir. 1993). The District Court found that the evidence in the record does not create a genuine issue of material fact on fraudulent concealment. See Marvin Lumber & Cedar Co., 34 F. Supp. 2d at 755. We agree.

The substance of Marvin's ordinary warranty claims is that PPG warranted that PILT would adequately prevent wood rot, but the product failed. The first critical question therefore is whether PPG fraudulently concealed PILT's alleged failure to prevent rot in Marvin's wood products. Acts that can constitute fraudulent concealment include outright misrepresentations, see Hines v. A.O. Smith Harvestore Prods., Inc., 880 F.2d 995, 998-99 (8th Cir. 1989) (applying Missouri law), or failures to disclose information when a duty of disclosure is present, such as in a fiduciary relationship, see Cohen v. Appert, 463 N.W.2d 787, 790-91 (Minn. Ct. App. 1990). No such disclosure duty arises from the arms-length transactions of the parties here. See Metropolitan Fed. Bank v. W.R. Grace & Co., 999 F.2d 1257, 1261 (8th Cir. 1993). Misleading partial disclosures, however, may constitute affirmative fraud, see M.H. v. Caritas Family Servs., 488 N.W.2d 282, 288 (Minn. 1992), and fraudulent concealment, see Iverson v. Johnson Gas Appliance Co., 172 F.3d 524, 529 (8th Cir. 1999) (discussing independent tort of fraudulent concealment). If there is evidence that PPG undertook fraudulently concealing acts, the second question would be whether Marvin still knew or should have known of the facts that make up its cause of action. See Hydra-Mac, Inc., 450 N.W.2d at 919. Because Marvin has not supplied any evidence of the necessary fraudulent acts, we need not reach the second inquiry.

In attempting to make out a triable case of fraudulent concealment, Marvin repeats many of its general contract and fraud claims, alleging that PPG misrepresented PILT's effectiveness and also that PPG made misrepresentations that, while not directly vouching for PILT's effectiveness, tend to support it. For example, Marvin alleges that

PPG misled Marvin about long-term research supporting PILT's effectiveness, about PILT's certification by an industry standards organization, about changes in the formulation and manufacturing process for PILT during the time Marvin bought it, and about the similarity between the type of PILT sold to Marvin and the type sold to a well-known competitor. All of these misrepresentations, Marvin alleges, fraudulently prevented Marvin from learning that PILT was failing. Marvin's argument fails because, even if PPG fraudulently made such representations, those acts do not constitute fraudulent concealment of Marvin's ordinary warranty claims.

Two cases are illustrative. In both <u>Hines</u> and <u>Miles</u>, the plaintiffs sued the manufacturer of a particular model of grain elevator that allegedly failed to protect its contents as promised. In both cases, defendant raised a statute of limitations defense. In <u>Hines</u>, the plaintiff alleged that, while inherent and known design defects were the cause of the elevator's failure, the seller misled Hines by fooling him into believing that the problem was faulty seals, which could be fixed, and the seller attempted to repair the seals. This Court held that a genuine issue of material fact existed as to fraudulent concealment. <u>See</u> <u>Hines</u>, 880 F.2d at 998. In <u>Miles</u>, the plaintiff alleged that the defendant misled her by continually extolling the virtues of the elevator model in printed material, all the while knowing that elevator did not work. This Court held that this conduct did not constitute fraudulent concealment. <u>See</u> <u>Miles,</u> 992 F.2d at 816. We noted that "[i]t would have been impossible" for the defendant to conceal the facts that gave rise to Miles's cause of action, because "the evidence was in [Miles's] yard." <u>Id.</u> We distinguished <u>Hines</u>, noting that the defendant there "lulled" the plaintiff into believing that the problems with elevator could be, and would be, repaired. <u>Id.</u> at 817.

These cases demonstrate that Marvin's generalized allegations that PPG fraudulently misrepresented PILT's effectiveness do not constitute fraudulent concealment, at least where Marvin still had access to the facts that would make out its cause of action. At all times, Marvin had access to each of the very facts that establish Marvin's breach of contract action, namely PILT's alleged failure to prevent

rot on Marvin's products. "The oral and written representations [that Marvin relies] on to support [its] fraudulent concealment argument did not, and indeed could not, prevent [Marvin] from discovering that [PPG's] promises concerning the virtues of [PILT] did not come to pass." Klehr v. A.O. Smith Corp., 87 F.3d 231, 238 (8th Cir. 1996) (applying Minnesota law and analyzing Hines, Miles, and Minnesota cases), aff'd, 521 U.S. 179 (1997) (certiorari granted on federal RICO claim only). To make out its warranty claim, Marvin need only show that PILT was not performing as promised, and the facts relating to that claim were not in PPG's test logs or in the documents relating to PPG's relationship with other customers, but rather those facts were in the hands of Marvin and its customers. None of PPG's alleged acts could have covered up the relevant facts.

Marvin comes closest to alleging fraudulent concealment by asserting that PPG misled Marvin about the cause of Marvin's rot problems. The record reflects that, faced with accusations by Marvin that PILT was failing, PPG told Marvin that PPG believed that Marvin's construction practices were to blame. At the time, PPG had information which both supported and undercut PILT's efficacy. For example, PILT's performance for several other customers had been positive, and laboratory tests of PILT produced many satisfactory results. On the other hand, some tests returned less favorable results, especially some water repellency tests. These facts are not evidence of affirmative fraud. Absent some duty to disclose, not present here, PPG was not required to inform Marvin of the facts that reflected poorly on PILT's performance. See Metropolitan Fed. Bank, 999 F.2d at 1261. PPG's denial of liability alone is certainly not fraudulent concealment. See Grand Island Express v. Timtpe Indus., Inc., 28 F.3d 73, 75 (8th Cir. 1994) (applying Nebraska law). At best, Marvin might be able to prove that PPG was wrong in stating that Marvin's construction practices resulted in Marvin's rot problem. But Marvin can point to no evidence that shows that PPG's representations about the cause of Marvin's rot problem were fraudulent. See Haberle v. Buchwald, 480 N.W.2d 351, 357 (Minn. Ct. App. 1992) ("Central to the concept of

fraud is a knowing and intentional statement, act, or refusal to act where a duty to act lies." (quoting trial court)).  Thus, Marvin's fraudulent concealment claim fails.

B.

We turn to Marvin's warranty-of-future-performance claims.  Under the U.C.C., a warranty explicitly extending to future performance presents an exception to the normal rule as to when a cause of action for breach of warranty accrues.  A cause of action for such a breach does not accrue until the breach is discovered or should have been discovered.  See Minn. Stat. § 336.2-725(2).  Marvin alleges that such a warranty exists here.  The District Court concluded the evidence in this case does not present a genuine dispute of material fact with respect to the existence of a warranty of future performance and therefore granted summary judgment to PPG.  See Marvin Lumber & Cedar Co., 34 F. Supp. 2d at 752-53.

An express warranty is created by "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain."  Minn. Stat. § 336.2-313(1)(a).  "It is not necessary to the creation of an express warranty that the seller use formal words such as 'warrant' or 'guarantee' or that the seller have a specific intention to make a warranty . . . . "  Id. § 336.2-313(2).  Nor is it necessary for the promise or affirmation of fact to be incorporated into a written document; oral representations may create an express warranty, even between sophisticated commercial parties.  See, e.g., Wilson v. Marquette Elecs., Inc., 630 F.2d 575,  579-80 (8th Cir. 1980) (applying U.C.C. under Arkansas law).

Only a specific type of express warranty, however, will suffice to alter the normal rule of accrual for breach of warranty actions.  Under the U.C.C., the warranty must "explicitly extend[] to future performance of the goods," Minn. Stat. § 336.2-725(2), or else the buyer's breach of warranty action accrues on tender of delivery.  The courts have vigorously enforced the U.C.C.'s statutory explicitness requirement.  See

Standard Alliance Indus., Inc. v. Black Clawson Co., 587 F.2d 813, 820 (6th Cir. 1978) (collecting cases), cert. denied, 441 U.S. 923 (1979). Implied warranties cannot, by their very nature, explicitly extend to future performance. See Western Recreational Vehicles, Inc. v. Swift Adhesives, Inc., 23 F.3d 1547, 1550-52 & 1551 n.3 (9th Cir. 1994) (collecting cases).

Moreover, an express warranty of the present condition of goods without a specific reference to the future is not an explicit warranty of future performance, even if the description implies that the goods will perform a certain way in the future. See Ray D. Henson, The Law of Sales § 7.16, at 334-35 (1985). A typical example is Western Recreational Vehicles, where the seller promised that its adhesive would work on the buyer's new Filon vehicles. This promise, while implicitly touching upon the future performance of the adhesive, did not specifically refer to a future time and therefore did not explicitly extend to future performance. See Western Recreational Vehicles, 23 F.3d at 1553.

This Court has restated the explicitness requirement variously. See Economy Housing Co. v. Continental Forest Prods., Inc., 805 F.2d 319, 321 (8th Cir. 1986) ("The overwhelming weight of authority requires a buyer . . . to prove that its seller specifically warranted the product for a defined period of time in the future.") (applying Nebraska law); R.W. Murray Co. v. Shatterproof Glass Corp., 697 F.2d 818, 823 (8th Cir. 1983) ("[T]he terms of the warranty must unambiguously indicate that the manufacturer is warranting the future performance of the goods for a specified period of time.") (applying Missouri law). While never having addressed the precise issues raised in this case, the Minnesota courts appear to follow the majority of jurisdictions in future-performance warranty cases. See Church of Nativity of Our Lord v. WatPro, Inc., 491 N.W.2d 1, 3 (Minn. 1992).

The evidence in this case suggests that PPG made several representations about PILT. By deposition, William and Jake Marvin testified about statements made by Bob

Panchot, a PPG executive, in 1984. The Marvins' testimony, which we must accept as true for summary judgment purposes, see Carter v. Chrysler Corp., 173 F.3d 693, 696 (8th Cir. 1999), alleges that Panchot made statements about PILT's long-term effectiveness. Specifically, Jake Marvin's testimony asserts that Panchot said, among other things: "[PILT] will out last that [P]enta. It will out last the windows that you [William Marvin] have in your home at 26 years. It's a better product." Report & Recommendation of August 6, 1998 ("R&R") at 108. William Marvin's testimony is somewhat different, but also asserts that Panchot favorably compared PILT's performance to Penta's twenty-plus years of success in protecting the windows on the Marvins' home. See R&R at 107-08. Marvin also points to other statements by PPG representatives that PILT was comparable or superior in performance to Penta as well as to statements touting PILT's effectiveness at preventing wood rot and similar matters.

The District Court held that, as a matter of law, none of these representations would constitute a warranty explicitly extending to future performance. See Marvin Lumber & Cedar Co., 34 F. Supp. 2d at 753. With regard to descriptions of PILT's positive qualities, such as statements that PILT prevents wood rot or is a "better product" than Penta, the District Court concluded that such descriptions were inadequate because they did not explicitly refer to the future. See id. With regard to the comparison to Penta's longevity, the Magistrate Judge noted that, based on the record, "the expected life of millwork, which had been treated with Penta, was anywhere from twenty to fifty years." R&R at 109. The District Court, following the Magistrate Judge, concluded that Panchot's alleged statement that PILT would outlast Penta was thus too "imprecise" to constitute a warranty explicitly extending to future performance. Marvin Lumber & Cedar Co., 34 F. Supp. 2d at 753.

The District Court was undoubtedly correct that PPG's general representations about PILT do not constitute warranties extending to future performance. Most of the alleged statements do not specifically refer to the future at all. Thus, for example, a

-10-

representation that PILT was a "better" product than Penta, besides being unenforceable puffery, see Ruffin v. Shaw Indus., Inc., 149 F.3d 294, 302 (4th Cir. 1998), is also merely a description of the present qualities of the good. Thus, any action for breach of warranty based on these representations is long expired.

But two of the representations specifically refer to a future time. Panchot allegedly said that products treated with PILT would last as long as products treated with Penta, and he also allegedly said that products treated with PILT would last longer than the windows on the Marvin home, which had been treated with Penta and already had lasted twenty-six years. The District Court appeared to recognize that these statements explicitly refer to the future performance of the goods, but held that they were insufficient to alter the applicable accrual rule because there was no "explicit length of warranty." Marvin Lumber & Cedar Co., 34 F. Supp. 2d at 753. The District Court also quoted the Magistrate Judge's finding that the performance of Penta was too "imprecise [a] benchmark." Id.

PPG appears to argue that a warranty of future performance can be valid only if its length is stated in a number of years. The only statutory support for such a contention, the requirement that a warranty "explicitly extend to future performance," cannot bear the weight that such an interpretation places upon it. A warranty may obviously extend to the future performance of a product, even if the length of warranty coverage is imprecise. A warranty for the "lifetime" of a product, for example, is enforceable as a future performance warranty. See Providence Village Townhouse Condominium Ass'n v. Amurcon-Loudoun Corp., 24 U.C.C. Rep. Serv. 2d 864, 870 (Va. Cir. Ct. 1994) ("plywood would last for the life of the roof"); Rempe v. General Elec. Co., 254 A.2d 577, 578 (Conn. Super. Ct. 1969) (disposal unit "would work properly during its lifetime"); 1 James J. White & Robert S. Summers, Uniform Commercial Code § 11-9, at 608-09 (4th ed. 1995); see also Economy Housing Co., 805 F.2d at 321 (characterizing reference to "lifetime" of house as "explicit reference to a future time period"). Obviously, there may be a fact question about how long the

relevant "lifetime" may be, but this imprecision cannot mean that a lifetime warranty does not explicitly extend to the future. See Rempe, 254 A.2d at 579 ("What, if her claim is found proven, 'lifetime' means concretely, in terms of years or some other unit of time, will have to await a future determination."). Likewise, in this case, there may be a question about how long products treated with Penta last, but that does not mean that Pachot's alleged statement that PILT-treated products would outlast Penta-treated products does not explicitly extend to the future performance of PILT.

We conclude a genuine issue of material fact exists with respect to an explicit warranty of future performance. The existence of such a warranty, however, would not automatically make Marvin's claim timely. Assuming that a future warranty is present, Marvin's breach of warranty claim accrued when Marvin learned or should have learned of the breach, see Minn. Stat. § 336.2-725(2), and expires four years thence, see id. § 336.2-725(1). "[T]he statute of limitations begins to run 'when the plaintiff discovers or should have discovered the defendant's refusal or inability to maintain the goods as warranted . . . .'" Watpro, 491 N.W.2d at 6 (quoting Smith v. Union Supply Co., 675 P.2d 333, 335 (Colo. Ct. App. 1983)); accord Anderson v. Crestliner, Inc., 564 N.W.2d 218, 223 (Minn. Ct. App. 1997) (holding that breach occurred when seller told buyer that seller would do no more to rectify alleged warranty violation). There is evidence in the record that Marvin knew of some wood rot problems in 1990. The evidence also reflects that Marvin and PPG discussed the rot problems and, ultimately, in 1993, PPG gave Marvin a "formal" response to Marvin's requests for assistance. Based on this evidence, we conclude there is at least a jury question as to whether or not Marvin's future performance warranty claims are timely.

PPG argues for affirmance of the District Court's decision on an alternate ground—that PPG expressly disclaimed warranties for rot. The Magistrate Judge's Report and Recommendation noted that "the only written warranties between Marvin[] and PPG, which are evidenced in the Record, are a pair of warranties for topcoats and finishes." R&R at 106 n.31. These documents warrant against "film integrity failures,"

such as "cracking, peeling, [and] flaking." This "film integrity" coverage excludes "cracking of the finish due to substrate failure or movement"; the Magistrate Judge characterized this exclusion as "expressly disclaim[ing] any warranties against rot." R&R at 106 n.31. Neither the Magistrate Judge's Report and Recommendation nor the District Court's opinion addressed any argument by PPG that the alleged statements by Panchot, even if true, were legally inoperable because they conflicted with a written disclaimer of warranties. Even if the sales brochure pointed to by PPG constituted a disclaimer of all rot warranties regarding PILT, which is far from clear on the record before us, Minnesota law charges the courts with construing express warranties and disclaimers as consistent wherever reasonable. See Minn. Stat. § 336.2-316. Moreover, PPG does not point to an integration clause in the written document that might extinguish the operation of an oral express warranty as inconsistent with the written disclaimer. See St. Croix Printing Equip., Inc. v. Rockwell Int'l Corp., 428 N.W.2d 877, 880-81 (Minn. Ct. App. 1988). We leave the matter for the District Court's consideration in the first instance. We reject PPG's hyper-technical argument that Marvin waived its right to challenge the Magistrate Judge's "factual conclusion," contained in a footnote discussing an entirely different issue.

We reiterate that the vast majority of Marvin's contract claims are barred by the statute of limitations. We conclude that fact questions exist as to the existence of a warranty of future performance, as well as to whether Marvin's claims of breach of that warranty are timely. All the other warranty claims, including breaches of other express warranties, accrued upon tender of delivery and expired four years later, well before the filing of this lawsuit, and summary judgment was properly granted to PPG on those claims.

## III.

We turn to Marvin's tort claims. The District Court determined that Minnesota's economic loss doctrine bars all of Marvin's tort claims. The doctrine precludes a

commercial purchaser of a product from recovering economic damages through at least some tort actions against the manufacturer or seller of the product. See Superwood Corp. v. Siempelkamp Corp., 311 N.W.2d 159, 162 (Minn. 1981), see also Hapka v. Paquin Farms, 458 N.W.2d 683, 688 (Minn. 1990) (abandoning Superwood's exception for damage to "other goods" as between commercial parties). The doctrine was judicially created to protect the integrity of the U.C.C. bargaining process; it prevents tort law from altering the allocation of costs and risks negotiated by the parties. See Superwood, 311 N.W.2d at 161-62. Marvin advances two arguments. First, Marvin questions whether this is a commercial transaction within the meaning of the economic loss doctrine. Second, Marvin asserts that the economic loss doctrine does not apply to intentional fraud and misrepresentation.

A.

The common law of Minnesota governs the interplay between Marvin's tort claims, the U.C.C., and the economic loss doctrine. The relevant transactions took place between 1985 and 1988. The theretofore-common-law economic loss doctrine was not touched upon by the Minnesota legislature until 1991. See Minn. Stat. § 604.10. There is no statutory indication that the 1991 enactment was intended to apply retroactively. The Minnesota Supreme Court has explicitly left the question of the statute's retroactivity open. See Lloyd F. Smith Co. v. Den-Tal-Ez, Inc., 491 N.W.2d 11, 17 n.7 (Minn. 1992). That would, of course, be a question of state law, unless retroactive application transgressed constitutional boundaries. Given the presumption of non-retroactivity, it is most likely that the Minnesota Supreme Court would not apply the statute retroactively. See Ubel v. State, 547 N.W.2d 366, 369 (Minn. 1996); see also Minn. Stat. § 645.21 ("No law shall be construed to be retroactive unless clearly and manifestly so intended by the legislature."). Therefore, the statutory terms are not relevant and the common-law doctrine governs. The District Court made the same determination. See Marvin Lumber & Cedar Co., 34 F. Supp. 2d at 742-44.

After the District Court had already dismissed Marvin's fraud claims, Marvin persuaded the Minnesota legislature to amend its statutory law in April 1998. The amendment reads as follows: "This section shall not be interpreted to bar tort causes of action based upon fraud or on fraudulent or intentional misrepresentation or limit remedies for those actions." Minn. Stat. § 604.10(e). The amendment is explicitly retroactive to all actions pending or filed after the date of enactment. We agree with the District Court, however, that since the 1998 amendment only purports to control the interpretation of the statutory version of the economic loss doctrine, it does not apply to this case, which is governed exclusively by the prestatutory common law. While this case was on appeal, the Minnesota legislature again amended its statutory law. The statute now allows common-law misrepresentation claims between merchants so long as "the misrepresentation was made intentionally or recklessly." 2000 Minn. Laws ch. 358 (to be codified at Minn. Stat. § 604.101). This amendment, by its terms, is applicable only to transactions consummated after August 1, 2000. See id. ch. 358, sec. 1, subdiv. 6.

B.

The economic loss doctrine is broadest in its application to commercial transactions, as opposed to consumer transactions. See Hapka, 458 N.W.2d at 688. A transaction is commercial when the product is sold by "a merchant dealing with another merchant in goods of the kind." Lloyd F. Smith Co., 491 N.W.2d at 15. In Regents of Univ. of Minn. v. Chief Indus., Inc., 106 F.3d 1409 (8th Cir. 1997), we recently analyzed the Minnesota law on the subject. The University of Minnesota had purchased a grain drying unit from Chief Industries, and the unit allegedly failed and started a fire. After analyzing the Minnesota case law and Minn. Stat. § 336.2-104(1), we concluded that "[a] party is thus a 'merchant' of goods for purposes of the U.C.C. either: (1) by dealing in those goods; or (2) by way of specialized knowledge of the goods." Id. at 1411. Because the University had specialized knowledge in grain dryers, including having hired a leading expert as a consultant for the transaction, the

-15-

University was a merchant with respect to grain dryers, and therefore the economic loss doctrine applied. See id. at 1412. Judge Lay dissented, arguing for a narrower interpretation of "merchant in goods of the kind" that included only dealers in the goods at issue. See id. at 1413-15.

Following the majority in Chief Industries, the District Court determined that Marvin is a merchant with respect to window coatings. The Magistrate Judge recommended rejecting Marvin's "attempt to don the raiment of naive novitiates." R&R at 78. The District Court agreed, noting Marvin's bargaining strength, its long history of purchasing window treatments, and its activity with an industry standard-setting organization as strong evidence of the specialized knowledge requiring this conclusion. See Marvin Lumber & Cedar Co., 34 F. Supp. at 748.

Marvin argues that we should abandon Chief Industries. In the recent Jennie-O Foods, Inc. v. Safe-Glo Prods. Corp., 582 N.W.2d 576, 578-79 (Minn. Ct. App. 1998), the Minnesota Court of Appeals, as they are free to do, rejected the Chief Industries majority and instead followed Judge Lay's dissent. Concluding that Minn. Stat. § 336.2-104(1) does not supply a definition of "merchant of goods of the kind," the Jennie-O court found that a turkey farm operation was not a merchant with respect to heaters used in its brooding barns; the farm operation was clearly not a dealer in heaters. While we are loath to reject the considered judgment of a prior panel decision of our court, our task is to apply state law, and while decisions of the "various intermediate appellate courts are not [binding on us], . . . they are persuasive authority, and we must follow them when they are the best evidence of what [state] law is." Garnac Grain Co. v. Blackley, 932 F.2d 1563, 1570 (8th Cir. 1991); accord Commissioner v. Estate of Bosch, 387 US. 456, 465 (1967) (stating that intermediate state court decisions should be followed "unless [the federal court] is convinced by other persuasive data that the highest court of the state would decide otherwise"). Obviously, the opinions of reasonable jurists differ on the scope of "merchant of goods of the kind," making any prediction of the Minnesota Supreme Court's ultimate view

of the matter uncertain. In this case, because Marvin qualifies as a merchant of goods of the kind even under the more favorable standard in <u>Jennie-O</u>, we need not decide whether <u>Jennie-O</u> requires us to reject <u>Chief Industries</u>.

Marvin deals in wood preservatives. Marvin sells custom windows and doors made of wood, and one component of that woodwork is a wood preservative to ensure that the windows and doors are long-lasting. Marvin bought PILT and applied it to windows, which Marvin sold. Marvin's specialized knowledge, discussed by the District Court, combined with Marvin's sales of a product containing the very good that it bought from PPG, convinces us that Marvin is a dealer in PILT within the meaning of the economic loss doctrine consistent with the narrower definition set out in <u>Jennie-O</u> and Judge Lay's <u>Chief Industries</u> dissent to the extent they interpret the common law of Minnesota. If the definition of dealer were so narrow as to include only purchasers who resold a product unaltered, like a broker or distributor, the economic loss doctrine would be nearly meaningless. Marvin has little in common with the turkey farm in <u>Jennie-O</u>, which bought a heater, or the hypothetical businessman in Judge Lay's dissent, <u>see</u> <u>Chief Industries</u>, 106 F.3d at 1415 n.5, who regularly buys computers for use in his office. Those individuals are consumers with respect to those goods; a turkey farm is not in the heater business, nor is the hypothetical businessman in the computer business. Thus, if those goods fail, the buyers may seek consumer remedies. Marvin, by contrast, is in the business of selling treated wood products. Where a manufacturer with sophisticated knowledge of a component purchases and incorporates that component into its product, the manufacturer is a not merely a dealer with respect to finished product, but with respect to the component part as well. Thus, Marvin was a dealer with respect to the transactions here in issue and the economic loss doctrine operates to limit Marvin's claims.

C.

Given the application of the economic loss doctrine, Marvin's negligence and strict liability claims were properly dismissed. Whether the doctrine also bars fraud and misrepresentation claims, however, is more controversial. For example, six opinions on these questions have been rendered in the Eastern District of Wisconsin alone, each predicting how the Wisconsin Supreme Court will resolve the issues of whether and how the economic loss doctrine applies to intentional fraud. See Rich Prods. Corp. v. Kemutec, Inc., 66 F. Supp. 2d 937, 977-80 (E.D. Wis. 1999) (reviewing opinions and concluding that fraud claims are barred); Budgetel Inns, Inc. v. Micros Sys., Inc., 34 F. Supp. 2d 720, 722-25 (E.D. Wis. 1999) (reviewing opinions and concluding that fraud claims are not barred).

In AKA Distributing Co. v. Whirlpool Corp., 137 F.3d 1083 (8th Cir. 1998), a panel of this Court addressed the issue, analyzing Minnesota law. We noted that "countless . . . cases illustrate and . . . the U.C.C. confirms, the presence of a governing commercial contract neither preempts nor eliminates the need for all fraud claims to which the parties' dealings may give rise." Id. at 1086 (citing Minn. Stat. § 336.2-721 ("Remedies for material misrepresentation or fraud include all remedies available under this article for nonfraudulent breach.")). Therefore, the AKA court struck a balance between the competing considerations by concluding: "We think the Minnesota Supreme Court would resolve the legal issue in this case by holding that, in a suit between merchants, a fraud claim to recover economic losses must be independent of the Article 2 contract or it is precluded by the economic loss doctrine." Id. at 1087. Actionable claims "must be based on a representation that was outside of or collateral to the contract, such as many claims of fraudulent inducement." Id. at 1086. The panel applied the rule to the case before it and concluded that fraud claims arising from an alleged promise that the plaintiff "would be a distributor for a long time" were barred because "duration was a term of the contract, and breach of that term was the basis for

[the plaintiff's] time-barred contract claim." Id. at 1087. By contrast, fraud claims based upon the defendant's alleged failure to disclose business plans harmful to the plaintiff were "the sort of collateral subject that can support an independent fraud-in-the-inducement claim." Id. Thus, that fraud claim was not barred by the economic loss doctrine, though it did fail for other reasons.

The reasoning of AKA leads us inexorably to the conclusion that Marvin's fraud claims are barred. Courts generally agree that fraud in the inducement, necessarily prior to the contract, is independent of the contract and therefore not barred by the economic loss doctrine. A leading Michigan case explains as follows:

> Fraud in the inducement presents a special situation where parties to a contract appear to negotiate freely—which normally would constitute grounds for invoking the economic loss doctrine—but where in fact the ability of one party to negotiate fair terms and make an informed decision is undermined by the other party's fraudulent behavior.

Huron Tool & Eng'g Co. v. Precision Consulting Servs., 532 N.W.2d 541, 545 (Mich. Ct. App. 1995).

This concept, which has been referred to as an exception to the economic loss doctrine, is non-controversial. Indeed, the exception was cited approvingly in AKA, 137 F.3d at 1086. A limitation on this exception, announced by Huron and followed in other courts, is more difficult. The Huron court opined that in cases "where the only misrepresentation by the dishonest party concerns the quality or character of the goods sold," the economic loss doctrine bars the fraud claims because the fraud claims are substantially redundant with warranty claims. Huron, 532 N.W.2d at 545.

Here, the District Court and the Magistrate Judge used the "quality and character of the goods sold" limitation to find the fraud claims not independent of the contract and accordingly barred. Undoubtedly, all of Marvin's fraud claims relate to the efficacy

-19-

of the wood preservative, which is also the subject of Marvin's warranty claims. Considering that representations or descriptions about goods may become express warranties, see Minn. Stat. § 336.2-313(1), it is clear here that Marvin's fraud claims concerning representations about PILT are not independent of the contract and therefore were properly dismissed.[1]

Marvin argues that we should reject <u>AKA</u>, as does the State of Minnesota as Amicus Curiae. In this instance, however, there is no strong new evidence indicating the Minnesota Supreme Court would find otherwise. Instead, Marvin can only point to decisions in other jurisdictions. <u>See, e.g.</u>, <u>United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.</u>, 210 F.3d 1207, 1226-27 (10th Cir. 2000) (applying Colorado law); <u>Douglas-Hanson Co. v. BF Goodrich Co.</u>, 598 N.W.2d 262, 269 (Wis. Ct. App. 1999), <u>aff'd by equally divided court</u>, 607 N.W.2d 621(Wis. 2000). We also note a recent academic work written by Marvin's counsel. <u>See</u> Steven C. Tourek et al., <u>Bucking the "Trend": The Uniform Commercial Code, the Economic Loss Doctrine, and Common Law Causes of Action for Fraud and Misrepresentation</u>, 84 Iowa L. Rev. 875 (1999).

---

[1]The dissent's argument that Marvin's fraud claims are independent of the contract is somewhat astonishing. Ultimately, Marvin's fraud claims all revolve around one central allegation: PPG mislead Marvin into believing that PILT would be an effective product, but PILT failed. The only harms alleged arose from PILT's inefficacy, not, for example, from PILT's difficulties with certification. As the dissent recognizes, commercial parties may protect themselves against the risk of product failure by securing warranties. Moreover, as we have pointed out, PPG's alleged representations may have created express warranties pursuant to Minnesota law, and, if so, the warranties became terms of the contract between Marvin and PPG. Indeed, Marvin's complaint alleges the breach of express warranties based on the same vast array of representations that make up its fraud claims. As Part II explains, however, because Marvin waited too long to file suit, most of those warranty claims are now time-barred. Marvin may yet have a winning warranty-of-future-performance claim, but to allow Marvin to resurrect its other expired warranty claims through tort would be precisely the kind of subversion of the U.C.C. that the economic loss doctrine is intended to prevent.

This is insufficient, however, for us to disregard our decision in <u>AKA</u>, especially when it is in line with other recent authority on the subject. See <u>All-Tech Telecom, Inc. v. Amway Corp.</u>, 174 F.3d 862, 866 (7th Cir. 1999) (collecting cases).

Two other pieces of data are the recent statutory amendments by the Minnesota legislature. We have determined that the amendments simply do not apply to the conduct relevant here, which is instead governed by the Minnesota common law. Even if inapplicable, Marvin and the State of Minnesota argue, the statutory amendments demonstrate Minnesota's general policy against fraud and specific policy against expansive application of the economic loss doctrine. They assert that this statutory policy should be considered in applying the common-law economic loss doctrine. See <u>Kampsen v. County of Kandiyohi</u>, 441 N.W.2d 103, 106 (Minn. 1989) ("Since time immemorial, in the absence of a statute specifically governing a given issue, common law courts have structured rules to resolve the specific issue before them by analogizing to statutes covering the same general subject matter."); see also <u>Morgane v. States Marine Lines, Inc.</u>, 398 U.S. 375, 390-93 (1970) (relying on inapplicable statutory rules in overruling common-law rule contrary to the policy expressed by the statutes). Here, however, application of textually irrelevant statutes as "policy" would be tantamount to their retroactive application. The law in general, and Minnesota law in particular, strongly disfavors retroactive legislation. See <u>Landgraf v. USI Film Prods.</u>, 511 U.S. 244, 264 (1994); <u>Ubel</u>, 547 N.W.2d at 369. Thus, we doubt that the Minnesota Supreme Court would expand the statutes by giving them more retroactive effect than their text requires.

Similarly, if we were to abandon <u>AKA</u> because of the statutory amendments, it would raise constitutional questions akin to the direct application of the statutes. The Magistrate Judge refused to apply the first statutory amendment because he found it would amount to an unconstitutional impairment of the contractual obligations between Marvin and PPG, relying on evidence that the amendment was passed specifically to benefit Marvin at the expense of out-of-state interests. See R&R at 60-70. If we were

to give effect to the statutory amendments by considering them as policy, similar, although more complicated, constitutional issues would be present. Cf. Cross Lake Shooting & Fishing Club v. Louisiana, 24 U.S. 632, 639 (1912) (stating that, while only legislative acts can violate the contract clause, court decisions that "give effect" to legislation may suffice). But see Mariniello v. Shell Oil Co., 511 F.2d 853, 859-60 (3d Cir. 1975) (rejecting contract clause claim where New Jersey Supreme Court effectively gave retroactive force to statute by crafting new common-law rule modeled after statute). We avoid the constitutional questions by refusing to give the inapplicable statutes controlling weight. See Spector Motor Serv., Inc. v. McLaughlin, 323 U.S. 101, 105 (1944) (discussing "deeply rooted" doctrine that courts should avoid constitutional questions unless issue is "unavoidable").

Alternatively, Marvin attempts to distinguish AKA on the ground that AKA does not apply to sales of goods contracts under Article 2 of U.C.C. The AKA court, true, did note that the contract at issue was "a different type of Article 2 contract," AKA, 137 F.3d at 1086 n.3; this distinction was important in determining whether to apply the common-law or statutory version of Minnesota's economic loss doctrine. AKA applied the common-law version, as we do here. Marvin simply offers no reason why the kind of contract at issue in AKA should be treated differently under the common law than the kind of contract at issue in this case. Without a meaningful factual distinction, AKA controls.

In addition to asserting fraudulent concealment as a tolling mechanism, Marvin also pleaded fraudulent concealment as an independent tort. We have previously concluded that Marvin lacks proof of fraudulent concealment as a tolling mechanism. Marvin likewise lacks proof to make out a tort claim, and in any event, this tort claim is indistinguishable from Marvin's general fraud claim and is essentially redundant of its warranty claims. We therefore conclude, as did the district court, see Marvin Lumber & Cedar Co., 34 F. Supp. 2d at 749 n.9, that the facts will not support an independent tort in light of the economic loss doctrine. This conclusion is buttressed

by Minnesota law, independent of the economic loss doctrine, suggesting that such an independent fraudulent concealment claim will not lie where the fraudulent concealment relates to a promisor's duties under the contract. See Cherne Contracting Corp. v. Wausau Ins. Co., 572 N.W.2d 339, 345 n.2 (Minn. Ct. App. 1997).

IV.

We finally address Marvin's statutory claims. Marvin seeks redress under three Minnesota statutes, Minn. Stat. §§ 325D.13, 325F.67, and 325F.69, as well as statutory claims based on Tennessee law.

In the circumstances of this case, the Minnesota consumer protection statutes do not apply to a merchant such as Marvin. The Minnesota Supreme Court addressed a similar situation in WatPro, 491 N.W.2d 1. In examining how consumer protection statues can co-exist with the U.C.C., the court drew a sharp distinction between commercial parties and consumers. See id. at 7. Because the plaintiff church was not a "sophisticated merchant" with respect to the purchase in question, the court concluded that "[t]he transaction at issue here is an ordinary consumer transaction within the scope of state statutes regulating sales to consumers." Id. at 8. Since the WatPro court had a claim under Minn. Stat. § 325F.69 before it, our conclusion that Marvin is a merchant with respect to window treatments quickly disposes of Marvin's claim under that statute. See also Ly v. Nystrom, 602 N.W.2d 644, 647 (Minn. Ct. App. 1999) (holding that § 325F.69 does not protect merchants).

The language and reasoning of WatPro also clearly sweep broadly enough to apply to a related Minnesota statute relied upon by Marvin. The statute, Minn. Stat. § 325D.13, part of the Unlawful Trade Practices Act, is similarly designed to protect consumers. See Minn. Stat. § 325D.09 ("The legislature of the state of Minnesota hereby finds: that the trade practices defined and prohibited by sections 325D.09 to 325D.16 . . . mislead consumers as to the quality, ingredients and origin of merchandise

-23-

purchased . . . ."). Thus, the holdings of WatPro and Nystrom teach that § 325D.13 does not apply to protect Marvin in the circumstances of the transactions involved in this case.

The third statute, Minn. Stat. § 325F.67, essentially proscribes false advertising. Prior to WatPro, the Minnesota Court of Appeals addressed the question of whether or not the statute applied where a commercial farm bought a grain silo on the basis of false advertisements. The defendants argued that the statute only applied to consumers. See Kronebusch v. MVBA Harvestore Sys., 488 N.W.2d 490, 494 (Minn. Ct. App. 1992). Concluding that the statute was "silent" on that issue, the Kronebusch court nevertheless concluded that the statute "applies to the farmers as purchasers of silos." Id. at 494-95.

We ultimately believe, however, that the Minnesota Supreme Court would find that Minn. Stat. § 325F.67 does not apply to a merchant such as Marvin, for several reasons. First and foremost, Kronebusch was decided without the benefit of WatPro, which significantly undercuts its predictive value. Second, the facts of Kronebusch did not present the precise issue before us; the plaintiff, while a commercial farmer, was not described as a sophisticated merchant with respect to grain silos. The defendant appeared to argue that all commercial enterprises (i.e., all businesses) should be outside the protections of the statute. Third, it is clear that Minnesota's false advertising statute is primarily designed to protect consumers, not sophisticated merchants. Indeed, Minnesota's highest court recently described all three of the Minnesota statutes at issue in this case, including § 325F.67, noting that they "are generally very broadly construed to enhance consumer protection." State by Humphrey v. Philip Morris, Inc., 551 N.W.2d 490, 496 (Minn. 1996). Thus, the reasoning of WatPro applies as much to § 325F.67 as it does to § 325F.69. Fourth, and finally, the only post-WatPro decision of

the Minnesota courts to address the issue, albeit in an unpublished opinion, agrees. See Huntting Elevator Co. v. Biwer, No. C9-98-548, 1998 WL 747170 (Minn. Ct. App. Oct. 27, 1998). Thus, we have little doubt that the Minnesota Supreme Court would reach the same conclusion.

The District Court, therefore, properly dismissed all the Minnesota statutory claims. The Philip Morris case does not stand for any contrary proposition. There, the court allowed Blue Cross to pursue claims that clients of Blue Cross, consumers of cigarettes, were defrauded by the defendant cigarette manufacturers, to the detriment of Blue Cross. See Philip Morris, 551 N.W.2d at 496. Here, Marvin points to no evidence that PPG made any misrepresentation to any consumer. Moreover, Philip Morris is a case about standing, while WatPro concerns the substantive reach of the consumer protection statutes in light of tension with the U.C.C. See WatPro, 491 N.W.2d at 7-8; see also id. at 9 (Simonett, J., concurring in relevant part) (explaining how majority opinion is interpreting statutory language).

The District Court dismissed Marvin's statutory claims under Tennessee law based on that state's four-year statute of repose. See Marvin Cedar & Lumber Co., 34 F. Supp. 2d  at 755 (citing Tenn. Stat. § 47-18-110). Marvin only argues that the claims are timely because fraudulent concealment operated to toll the ticking clock. Given our conclusion that no fact question exists as to the fraudulent concealment of Marvin's contract claims, Marvin's Tennessee statutory claims are clearly barred.

V.

This is a fact-intensive case involving murky areas of state law. We commend the thorough and thoughtful analysis of the several District Court and Magistrate Judges. We affirm the District Court with respect to counts (I) and (III)-(XIII). We reverse, however, with respect to count (II), Marvin's express warranty claim,

concluding that fact questions exist as to whether a warranty of future performance was made to Marvin by PPG and as to whether that claim is timely.

LAY, Circuit Judge, concurring in part and dissenting in part.

With the exception of the majority's holding regarding Marvin's warranty of future performance claims, in which I concur, I cannot join the majority opinion. First, I disagree with the majority's definition of a "merchant in goods of the kind" and its application of the term to Marvin. Second, I disagree with the majority's treatment of Marvin's fraud and fraudulent inducement claims under the economic loss doctrine. I respectfully submit that throughout its analysis, the majority ignores a basic principle of federalism mandated in Erie R.R. v. Tompkins, 304 U.S. 64 (1938), that federal courts deciding diversity cases shall apply state substantive law and not their own interpretation of what the law should be.

A.      Merchant in Goods of the Kind

In Regents of the Univ. of Minnesota v. Chief Indus., Inc., 106 F.3d 1409 (8th Cir. 1997), this court tackled the proper definition of "merchant in goods of the kind" for purposes of applying the economic loss doctrine as codified at Minn. Stat. § 604.10. The majority in Chief Industries, relying on the U.C.C.'s definition of "merchant" as found at Minn. Stat. § 336.2-104(1), held that a merchant in goods of the kind need not be a dealer in like goods. Rather, the court found it sufficient that the merchant simply have "specialized knowledge of the goods." Chief Indus., 106 F.3d at 1411. The dissent in Chief Industries relied on Lloyd F. Smith Co. v. Den-Tal-Ez, Inc., 491 N.W.2d 11 (Minn. 1992), to urge that a "merchant in goods of the kind" is one who is a dealer in the same goods. The dissent noted:

When it enacted § 604.10(a) in 1991, had it so desired, the Minnesota legislature could have chosen the broad term "merchant" as generally

defined by § 336.2-104(1) instead of "merchants in goods of the kind." The legislature's choice instead to incorporate the limiting language [found in Den-Tal-Ez] manifests its intent to narrow application of the economic loss doctrine. There is no inconsistency in this obvious, clarifying provision, with § 336.2-104(1). The intended purpose of § 604.10 was to overcome Hapka's broad language, based on § 336.2-104(1), so that ordinary consumers will not be denied their "economic loss arising from the sale of goods."

In contrast, the majority opinion today declares that limiting § 604.10 to dealers "would create an unwarranted inconsistency" with § 336.2-104. But by incorporating § 336.2-104's broad definition of "merchant" as it regards goods of the kind (i.e., by including not just dealers but also others whose occupation or employment of another gains them some specialized knowledge in the goods) the majority contradicts the very intent of § 604.10.

Chief Indus., 106 F.3d at 1413-14 (Lay, J., dissenting) (footnotes omitted) (citations omitted).

In Jennie-O Foods, Inc. v. Safe-Glo Prods. Corp., 582 N.W.2d 576 (Minn. Ct. App. 1998), the Minnesota Court of Appeals made clear that state courts should follow the dissent in Chief Industries. The Jennie-O court rejected the reasoning set forth by the Chief Industries majority that years of experience in purchasing a product or a component thereof brings specialized knowledge, thereby qualifying the purchaser as a "merchant" under the U.C.C. and a "merchant in goods of the kind" under the economic loss doctrine. Instead, the Jennie-O court decided to adopt and apply the narrower definition of "merchant in goods of the kind" as set forth in Den-Tal-Ez and the Chief Industries dissent.

Notwithstanding the specific mandate of the Minnesota Court of Appeals, the majority in this case adopts the now rejected approach of the Chief Industries majority and applies the U.C.C.'s definition of "merchant" in determining whether Marvin is a

merchant in goods of the kind under Minnesota law. It concentrates on Marvin's "specialized knowledge" notwithstanding the Minnesota courts' rejection of that standard.

As the majority recognizes, federal courts must follow intermediate state court decisions "unless [the federal court] is convinced by other persuasive data that the highest court of the state would decide otherwise." Commissioner v. Estate of Bosch, 387 U.S. 456, 465 (1967). In the present case, the majority reasons:

> Where a manufacturer with sophisticated knowledge of a component purchases and incorporates that component into its product, the manufacturer is a not merely a dealer with respect to finished product, but with respect to the component part as well. Thus, Marvin was a dealer with respect to the transactions here in issue and the economic loss doctrine operates to limit Marvin's claims.

This reasoning is not in accordance with Minnesota law. Under Jennie-O, a merchant in goods of the kind is not so characterized merely by its specialized knowledge. It is equally untenable to argue that a party is a dealer (and, thus, a merchant in the goods of the kind) because of its sophisticated knowledge of a product component.

The majority's erroneous analysis leads it to hold that Marvin, with its sophisticated knowledge of a component part, is "in the business of selling treated wood products." While it is true that Marvin is engaged in the manufacture and sale of windows and wooden doors, in order to fit its own purposes the majority overstates the nature of Marvin's business. Marvin does not deal in raw lumber, it does not deal in plate glass, and, likewise, it does not deal in wood preservatives. In its relationship with PPG, Marvin is a consumer who simply uses wood preservatives as a component part in its windows. Under the majority's rationale, every manufacturer who buys a widget in order to manufacture a product will always be deemed to be a merchant who deals in widgets. There is no law in Minnesota or elsewhere which supports this

position.[2]  As such, Marvin is not a merchant in goods of the kind, and, in accordance with <u>Den-Tal-Ez</u>, the economic loss doctrine should not prevent Marvin from alleging damages to other property as a result of the defective PILT.

B.        Fraud and Misrepresentation

The majority bars all fraudulent misrepresentations not independent of the Article 2 contract under Minnesota's economic loss doctrine.  It does so not on the basis of Minnesota law, but upon another court of appeals panel's prediction of Minnesota law found in <u>AKA Distrib. Co. v. Whirlpool Corp.</u>, 137 F.3d 1083 (8th Cir. 1998).  I respectfully submit that our court in <u>AKA</u> overlooked the Minnesota Supreme Court's treatment of fraudulent claims in the face of the economic loss doctrine as set forth in <u>Buller v. A.O. Smith Harvestore Prods., Inc.</u>, 518 N.W.2d 537 (Minn. 1994).  Furthermore, I respectfully submit that the majority's reliance upon <u>AKA</u>, to the extent it is a proper prediction of state law, is misplaced.

The Minnesota Supreme Court first introduced the economic loss doctrine in <u>Superwood Corp. v. Siempelkamp Corp.</u>, 311 N.W.2d 159 (Minn. 1981), *overruled on other grounds*, <u>Hapka v. Paquin Farms</u>, 458 N.W.2d 683 (Minn. 1990), borrowing from the California Supreme Court's decision in <u>Seely v. White Motor Co.</u>, 403 P.2d 145 (Cal. 1965) (in bank).  Nearly thirteen years later, in <u>Buller</u>, the court was again

---

[2]The majority supports its position by stating:  "If the definition of dealer were so narrow as to include only purchasers who resold a product unaltered, like a broker or distributor, the economic loss doctrine would be nearly meaningless."  It is not my position that only those who resell unaltered products qualify as dealers.  Rather, one must consider the relationship between the product purchased and the product sold. To say that Marvin is a dealer in PILT is the same as saying a fruit vendor is a dealer in the pesticides used to treat its crop.  Surely, such a broad understanding of the word "dealer" cannot stand.  Although the PILT is part of the finished product, its relationship to the essence of the finished product is sufficiently attenuated to prevent Marvin from qualifying as a dealer.

faced with a tort claim (this time a fraud claim) based on allegations of economic loss. In discussing the procedural history of the case, the court took note of the district court's dismissal of the plaintiffs' negligence and strict liability claims on the basis of the economic loss doctrine, as well as its decision to permit the plaintiffs' fraud claim to go forth. Without so much as a passing mention of the economic loss doctrine, the Minnesota Supreme Court considered the viability of the fraud claim. Thus, the court implicitly recognized that the fraud claim could be maintained if the parties had tried that issue by consent. By all appearances, the <u>Buller</u> court simply assumed that an action in common law fraud in Minnesota was not subsumed by the economic loss doctrine. Minnesota Statute § 604.10(e), which explicitly states that fraud claims are not barred under the economic loss doctrine, merely restates and codifies the Minnesota common law. On this basis, Marvin makes a strong argument that this court in <u>AKA</u> misapplied Minnesota law in making its prediction. Instead of focusing on this inherent weakness in <u>AKA</u>, however, the majority adopts its holding without question. This is error.

C.      Fraudulent Inducement to Contract

Even setting aside <u>Buller</u> and its effect on <u>AKA</u>'s prediction of state law, I find the majority has misapplied <u>AKA</u> to the facts of this case. In <u>AKA</u>, this court predicted that the Minnesota Supreme Court would apply the economic loss doctrine to preclude all fraud claims with the exception of those fraudulent misrepresentations made independent from and collateral to the contract. The majority makes a conclusory determination that Marvin's fraudulent inducement claim is not independent of the contract because it tangentially relates to the subject matter of the contract. The majority argues that Marvin's fraud claims "all revolve around one central allegation: PPG misled Marvin into believing that PILT would be an effective product, but PILT failed." The majority opinion goes on and says that the "only harms alleged arose from PILT's inefficacy, not, for example, from PILT's difficulties with certification." The

majority expresses astonishment at the argument that Marvin's fraudulent inducement claim is independent of and collateral to the breach of contract claim.

I respectfully submit that the majority's discussion misunderstands the basic principles of a claim of fraudulent inducement. Where the misrepresentation of present fact serves as an inducement for the contract, it is not duplicitous of the breach of contract claim. As the New York Court of Appeals stated in Deerfield Communications Corp. v. Chesebrough-Ponds, Inc., 502 N.E.2d 1003 (N.Y. 1986):

> The measure of damages recoverable for being fraudulently induced to enter into a contract which otherwise would not have been made is indemnity for the loss suffered through that inducement. Here the jury was properly allowed to award damages to defendant on the [fraudulent inducement] counterclaim for the costs to locate the goods, the costs to repurchase the goods, storage fees and disposal costs, and under the [breach of contract] counterclaim for the balance remaining due on the purchase price for the goods sold and delivered.

Deerfield, 502 N.E.2d at 1004-05 (quotation omitted). Thus, the policy behind the economic loss doctrine (i.e., the avoidance of duplicative damages) is not at issue when the tort alleged is fraudulent inducement.

The definition of "fraud in the inducement" as stated in Black's Law Dictionary 671 (7th ed. 1999), is:

> Fraud occurring when a misrepresentation leads another to enter into a transaction with a false impression of the risks, duties, or obligations involved; an intentional misrepresentation of a material risk or duty reasonably relied on, thereby injuring the other party without vitiating the contract itself, esp. about a fact relating to value.

In the earlier Sixth Edition of Black's Law Dictionary 661 (6th ed. 1990), "fraud in the inducement" is defined as a "[m]isrepresentation as to the terms, quality or other

aspects of a contractual relation."  Any fraudulent inducement made by a seller to a buyer to induce the buyer to enter into a contract will <u>always</u> relate to the subject matter of the contract; thus, the majority's test creates an inherent difficulty in ever finding a claim of fraudulent inducement independent of the contract.  This analysis overlooks the fundamental basics of a fraudulent inducement claim.

Moreover, the Tenth Circuit in <u>United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.</u>, 210 F.3d 1207 (10th Cir. 2000), cogently explained why fraudulent inducement claims should not be barred under the economic loss doctrine.

> Where a negligence claim is based only on breach of a contractual duty, the law of contract rightly does not punish the breaching party, but limits the breaching party's liability to damages that naturally flow from the breach.  It is an altogether different situation where it <u>appears</u> two parties have in good faith entered into a contract but, in actuality, one party has deliberately made material false representations of past or present fact, has intentionally failed to disclose a material past or present fact, or has negligently given false information with knowledge that the other party would act in reliance on that information in a business transaction with a third party.  The breaching party in this latter situation also is a tortfeasor and may not utilize the law of contract to shield liability in tort for the party's deliberate or negligent misrepresentations.

<u>United Int'l Holdings</u>, 210 F.3d at 1226-27.

Hence, the basic obstacle in the majority's application of <u>AKA</u> to fraudulent inducement claims in general is difficult to surmount.  However, the majority's position is even more untenable when one considers the facts underlying Marvin's fraud in the inducement claim.

1.    Marvin's Fraudulent Inducement Claim

Marvin urges that the record supports allegations of fraudulent inducement in four ways. First, Marvin claims PPG represented that it undertook years of long-term field testing of Marvin's PILT formulation. Marvin supports this allegation with detailed evidence that, if true, leaves no question that a reasonable jury could find such representation was made and that it was false. Obviously this claim "relates" to the contract; however, such inducement is not subsumed by Marvin's warranty claims. The representation has nothing to do with the quality of the preservative, which is allegedly covered by the warranty claims. Rather, it relates to the history and background of the formulation's use. If true, Marvin's allegations expose a deceitful, independent inducement by PPG to buy its product.

The second allegation of fraudulent inducement is PPG's supposed representation that Marvin would receive the same PILT formulation as that used by Andersen Windows, an industry leader for which Marvin holds high regard. This representation relates to neither the quality nor the character of the PILT formulation. It does relate, however, to the identity of the formulation to be sold. If false, this representation constituted clear trickery by PPG to independently induce Marvin to enter into the contract. To suggest that this representation relates to the quality and character of the product and is thereby covered by warranty requires syllogistic reasoning that gives way to the most simplistic challenge. If the product sold to Marvin was indeed defective, as is now claimed, that is totally irrelevant to whether Andersen Windows used the same formulation with success.

The third allegation of fraudulent inducement relates to PPG's representation that the PILT formulation successfully met industry standards and tests. One would assume that a product that successfully met those standards and tests would be trustworthy; however, there was nothing in the negotiations between Marvin and PPG which

required the PILT to meet such standards. Thus, the representation is wholly independent of the contract, and the alleged statement served as an independent inducement for Marvin to purchase the PILT.

Finally, Marvin's claim that PPG used a "bait and switch" technique by supplying Andersen PILT for testing and switching the formulation at the time of Marvin's purchase is sufficiently collateral to the contract to survive the economic loss doctrine and <u>AKA</u>. Marvin asserts that the PILT it purchased was not the same as the test samples PPG supplied. This allegedly fraudulent misrepresentation has nothing to do with the contract other than to induce Marvin to believe that the PILT sold to it was the same formulation that Andersen used. Once again, the fraud relates to the identity of the product being sold rather than the quality or character of the PILT.

2.      Application of *AKA* and *Huron Tool*

The majority errs in its overly broad application of <u>AKA</u> and the economic loss doctrine. As the Seventh Circuit recently stated in <u>All-Tech Telecom, Inc. v. Amway Corp.</u>, 174 F.3d 862, 866-67 (7th Cir. 1999):

> Some of our cases describe the economic-loss doctrine in words that might seem to imply the abolition of the tort of misrepresentation (including deliberate fraud) in all cases in which the plaintiff and the defendant are business firms having a preexisting contractual relationship that had given rise to the fraud or other misrepresentation. . . .
>
> If commercial fraud is to go completely by the boards, as a literal reading of some of the economic-loss cases might suggest, then prospective parties to contracts will be able to obtain legal protection against fraud only by insisting that the other party to the contract reduce all representations to writing, and so there will be additional contractual negotiations, contracts will be longer, and, in short, transaction costs will be higher. And the additional costs will be incurred in the making of

<u>every</u> commercial contract, not just the tiny fraction that end up in litigation. Granted, there are costs of uncertainty from the possibility of falsely charging fraud when a contractual relationship sours, as it did in this case. But the fraud tort comes with safeguards against false claims, such as the requirement of pleading fraud with particularity and (in many though not all jurisdictions) a heightened burden of proof–clear and convincing evidence versus a bare preponderance of the evidence, the standard civil burden.

Applying this observation to the facts of the case at bar, how would one contemplate a warranty relating to testing, national approval, bait and switch tactics, and successful use by others? To require parties to anticipate misrepresentations on such extraneous subjects is to force them to enter into contractual negotiations with a general and perhaps unbased distrust and suspicion of each other. Marvin's claim should not be stifled by such an irrational interpretation of the economic loss doctrine.

It is indisputable under the case law that an independent tort, for purposes of the <u>Huron Tool</u> exception, "requires proof of facts separate and distinct from the breach of contract." <u>Eye Care Int'l, Inc. v. Underhill</u>, 92 F. Supp. 2d 1310, 1315 (M.D. Fla. 2000) (quotation omitted). The facts which comprise Marvin's breach of warranty claims are completely separate from those forming the basis of the fraudulent inducement allegations. Marvin argues that PPG breached its warranty of future performance by stating that PILT is equally or more effective than Penta and expressly representing to Marvin that PILT would remain effective in preventing rot for at least twenty-six years. The aforementioned fraudulent inducement claim makes no mention of these or any other statements of future performance. Thus, the evidence necessary to prove Marvin's fraud in the inducement claim is separate and distinct from that required to prove breach of warranty by PPG. In fact, the fraud allegations could conceivably be actionable even if PILT had worked as it was intended.

A survey of the cases applying the independent fraud requirement of the economic loss doctrine shows that Marvin's allegations are not of the same nature as

other types of commonly barred misrepresentations. Those representations which are frequently barred either restate the underlying defect that is the basis for the breach of contract claim or reiterate the breaching party's failure to perform under the contract. Marvin's claims do neither.

        a. *Allegations Related to Product Defect*

The quality and characteristics exception, as articulated in <u>Huron Tool and Eng'g Co. v. Precision Consulting Servs., Inc.</u>, 532 N.W.2d 541 (Mich. Ct. App. 1995), and its progeny, is a method of forcing parties to execute warranties to protect against defects that the contracting parties could rationally foresee as hampering the effectiveness of the product. As the Supreme Court of Wisconsin explained in <u>Northridge Co. v. W.R. Grace and Co.</u>, 471 N.W.2d 179, 185 (Wis. 1991), economic loss damages are "intended to protect purchasers from losses suffered because a product failed in its intended use." Hence, product defects in the suitability and quality of the good are redressed through actions in contract. <u>See</u> <u>id.</u> Likewise, under the economic loss doctrine, "where the only misrepresentation by the dishonest party concerns the quality or character of the goods sold, the other party is still free to negotiate warranty and other terms to account for <u>possible defects in the goods</u>." <u>Huron Tool</u>, 532 N.W.2d at 545 (emphasis added). <u>See also</u> <u>Rich Prods. Corp. v. Kemutec, Inc.</u>, 66 F. Supp. 2d 937, 969 (E.D. Wis. 1999) ("When contractual expectations are frustrated because of a defect in the subject matter of the contract, a party's remedy lies exclusively in contract."); <u>Douglas-Hanson Co. v. BF Goodrich Co.</u>, 598 N.W.2d 262, 267 (Wis. Ct. App. 1999) (same), *aff'd*, 607 N.W.2d 621 (Wis. 2000) (per curiam); <u>Theuerkauf v. United Vaccines Div. of Harlan Sprague Dawley, Inc.</u>, 821 F. Supp. 1238, 1241-42 (W.D. Mich. 1993) ("[T]he only remedy for claims relating to the performance of the product, such as a claim that the product did not work as it was supposed to work, may be brought under contract law."). Because

Marvin's fraudulent inducement claim is unrelated to the underlying defects in PILT, it should not fall victim to this application of the economic loss doctrine.[3]

---

[3]The Seventh Circuit, as well as district courts in Michigan, Wisconsin, New York, and Pennsylvania, have all applied the economic loss doctrine to claims restating liability for product defects. A review of the applicable case law makes clear that Marvin's fraud in the inducement claim is of a different ilk.

In Cooper Power Sys., Inc. v. Union Carbide Chems. & Plastics Co., 123 F.3d 675 (7th Cir. 1997), the parties entered into a contract for the sale of resin used by the plaintiff in a protective coating system. After the resin failed, plaintiff alleged fraud in the defendant's failure to inform it of problems with color instability and its inability to meet minimum product specifications. The Seventh Circuit found plaintiff's fraud claims "ultimately concern[ed] the quality of the product sold," and were thus barred. Cooper Power, 123 F.3d at 682.

In Allmand Assocs., Inc. v. Hercules Inc., 960 F. Supp. 1216 (E.D. Mich. 1997), the defendant made a series of representations regarding the abilities of its "METTON®" molding process, including: (1) "METTON® would enable Allmand to make high volume parts under low pressures and increase its customer base;" (2) the product was an "extremely versatile liquid resin that was tougher, lighter, more cost efficient and more flexible in design capability than other engineering compounds;" (3) "it had the potential of molding ribs and bosses with a Class A surface and no sinks or indentations;" (4) the "cycle time for molding . . . would be 2.5 to 3.5 minutes, that secondary finishing was not required, that only minimal cleaning would be required, and that the parts produced by METTON® would be easily paintable;" and (5) METTON® would be "compatible with Allmand's zinc . . . alloy tools." Allmand, 960 F. Supp. at 1219. Allmand sued for fraud on these representations, but the court found that the claims were barred because they concerned the quality and characteristics of METTON®. Similarly, in a case out of the Western District of Michigan, Martin v. A.O. Smith Corp., 931 F. Supp. 543 (W.D. Mich. 1996), plaintiffs alleged the defendant knowingly misrepresented the "oxygen-limiting" capacity of its silos, and the court rejected the fraud claim as related only to the quality or character of the silos. Likewise, in Theuerkauf v. United Vaccines Div. of Harlan Sprague Dawley, Inc., 821 F. Supp. 1238 (W.D. Mich. 1993), the district court rejected the plaintiff's fraud allegations regarding the defendant's supposed misrepresentation of the safety of a

vaccine injected in the plaintiff's breed stock mink and its failure to warn the plaintiff of harmful side effects.

The court in Raytheon Co. v. McGraw-Edison Co., 979 F. Supp. 858 (E.D. Wis. 1997), rejected a plaintiff's allegations that the defendant committed fraud in its sale of contaminated land. The court found the fraud claims "inseparably embodied" within the terms of the underlying contract. Raytheon, 979 F. Supp. at 873. The representations at issue in Rich Prods. Corp. v. Kemutec, Inc., 66 F. Supp. 2d 937, 977 (E.D. Wis. 1999), related to a mechanical conveyor's alleged ability to "handle or move mountains of almost anything," suitability for use in the bakery industry, "excellent experience in handling bakery materials and products," "good track record," and suitability for the plaintiff's uses and requirements. The conveyor failed to perform in accordance with expectations, and the plaintiff sued in tort. The court rejected the fraud claims because they "mirror[ed] the warranties of merchantability and fitness for a particular purpose which . . . became part of the contract as supplementary terms under the UCC." Id. Similarly, in Shandwick Holdings, Ltd. v. Carver Boat Corp., 93 F. Supp. 2d 1043 (E.D. Wis. 2000), the defendant allegedly misrepresented that the yacht the plaintiff sought to purchase was suitable for use on the Mediterranean Sea. The court dismissed the claim as ultimately concerning the yacht's quality.

The district court in Barroso v. Polymer Research Corp., 80 F. Supp. 2d 39 (E.D.N.Y. 1999), was faced with fraud claims related to the properties of a chemical formula used in colorizing metal objects. The defendant allegedly stated that the formula could be applied to aluminum of varying thickness, the results were not dependent on the speed of application, the plaintiff did not need to modify its own metal treatment procedures before applying the formula, the formula could withstand high temperatures, and bending and cutting the treated metal would not effect colorization. The plaintiff sued for fraud on these representations after the product failed, and the court rejected the claim because it "stem[med] entirely from an alleged breach of duties assumed under an agreement with defendant." Barroso, 80 F. Supp. 2d at 44. Finally, in Closed Circuit Corp. v. Jerrold Elecs. Corp., 426 F. Supp. 361 (E.D. Pa. 1977), plaintiff sued defendant for the fraudulent sale of faulty and defective electronics, alleging reliance on the defendant's representations as to the design, engineering and manufacture of the equipment. The plaintiff's complaint stated that it had relied on the defendant's representations that the equipment would work for its intended purposes, but it did not. The court found the claims were more appropriately

-38-

The running theme in this category of cases is the recharacterization of a contract-breaching defect as a fraudulent misrepresentation. All the rejected allegations relate to the cause of the failure in the subject of the contract. Marvin's fraudulent inducement claim, however, does not recharacterize the contract-breaching defect as a fraudulent misrepresentation. The fraud in the inducement asserted in this case does not allege hidden problems that prevented PILT from working properly; rather, Marvin alleges independent, affirmative misrepresentations unrelated to the internal efficacy of the PILT.

Indeed, in Closed Circuit Corp. v. Jerrold Elecs. Corp., 426 F. Supp. 361 (E.D. Pa. 1977), the court positively commented about a fraud claim strikingly similar to one of Marvin's claims. The defendant allegedly misrepresented that its electronic transmitter had received FCC-type acceptance when it had not yet received such approval. The court discussed the merits of this claim subsequent to, and separate from, its discussion distinguishing contract and tort claims. One of Marvin's fraud allegations involves PPG's representation that PILT successfully met industry standards. The similarity of this claim to that in Closed Circuit is clear. Marvin's claims are categorically different from those that restate contract-breaching defects and fall victim to the economic loss doctrine. Hence, the majority errs in barring Marvin's fraudulent inducement claims.

b.    *Allegations Related to Failure to Perform*

Allegations couched in terms of fraud and restating the breaching party's failure to perform under the contract also fall victim to the economic loss doctrine. See Dantzler Lumber & Export Co. v. Bullington Lumber Co., 968 F. Supp. 1543, 1547

brought under a contract theory.

-39-

(M.D. Fla. 1997) ("If claims relate to fraud in the performance, the economic loss rule will preclude fraud recovery."). Where claims of fraud are interwoven with the breach, the alleged misrepresentations concern the breaching party's performance under the contract, and the misrepresentations do not create an independent tort cause of action. See Huron Tool, 532 N.W.2d at 545. See also GBJ Corp. v. Eastern Ohio Paving Co., 139 F.3d 1080, 1088 (6th Cir. 1998) ("[T]he defendant must have fraudulently induced the plaintiff to enter into the agreement, and that inducement must be a promise other than merely pledging to perform the terms of the contract.").

In each of the cases within this category, the allegations of fraud revolve around the breaching party's failure to live up to its promises under the contract.[4]

---

[4]Again, a review of the applicable case law is helpful.

In Home Valu, Inc. v. Pep Boys, 213 F.3d 960 (7th Cir. 2000), the parties entered into a contract for the sale of real property. The defendant allegedly orally assured the plaintiff that it would purchase the property by the closing date, which was included in an amendment to the agreement. The defendant then backed out of the sale. The plaintiff claimed the representation was fraud in the inducement; however, the Seventh Circuit found the fraud claim barred by the economic loss doctrine. In GBJ Corp. v. Eastern Ohio Paving Co., 139 F.3d 1080 (6th Cir. 1998), the Sixth Circuit rejected a fraud claim based on the defendant's alleged promise to enter into a multi-part deal that was the basis of the breach of contract claim. The court explained: "The plaintiffs' complaint names the terms of the contract as the relevant promises. As such, the tort claim is indistinguishable from the contract claim, and cannot exist alongside it." GBJ, 139 F.3d at 1088.

The District Court for the Southern District of New York was faced with a fraudulent inducement claim based on nonperformance in Scholastic Inc. v. Harris, 80 F. Supp. 2d 139 (S.D.N.Y. 1999). Plaintiffs alleged that the defendants fraudulently induced them to enter a joint venture by misrepresenting the number of projects the defendants would develop and the amount of time and resources they would dedicate to the venture. The court dismissed the fraud claims, explaining that the claims were identical to the contractual duties which the defendants allegedly breached. In S.O.

-40-

Textiles Co. v. A & E Prods. Group, 18 F. Supp. 2d 232 (E.D.N.Y. 1998), the plaintiff contracted with the defendant for the purchase of hangers in which the defendant pledged to give the plaintiff a seven percent rebate on its purchases. The agreement fell through, and the plaintiff alleged the defendant never intended to give the rebate, but rather used it to induce the plaintiff to contract. The court found the allegations not extraneous to the terms of the contract. The parties in Hudson Optical Corp. v. Cabot Safety Corp., 971 F. Supp. 108 (E.D.N.Y. 1997), agreed to the sale and resale of safety glasses. The plaintiff alleged the defendant fraudulently misrepresented its intention to sell 72,700 of the plaintiff's frames, as well as its intention to promote the plaintiff's frames equally with its own. The claims were held to be insufficiently extraneous from the contract to withstand the economic loss rule.

The District Court for the District of Minnesota was faced with a nonperformance claim restated as a fraud claim in In re Grain Land Coop Cases, 978 F. Supp. 1267 (D. Minn. 1997). Grain producers and an agricultural coop association entered into contracts fixing the price for the deferred delivery of grain. A subsequent rise in grain prices led the coop to announce a series of policy changes, including the termination of the contracts. The producers sued on a theory of fraud, and the court found the tort claims proscribed by the economic loss doctrine. In Parkhill v. Minnesota Mutual Life Ins. Co., 995 F. Supp. 983 (D. Minn. 1998), the plaintiffs alleged the defendant fraudulently induced them to purchase "vanishing premium" life insurance policies by misrepresenting the nature of the product. Specifically, the defendant allegedly understated the number of out-of-pocket premium payments that would be required to maintain the policy. When the defendant failed to discontinue its premium assessments as required under the contract, the plaintiffs sued for fraud. The court rejected their claim, stating that "the representations made by defendant are at the heart of the dispute over the parties' agreement." Parkhill, 995 F. Supp. at 994.

In Ice Bowl L.L.C. v. Weigel Broadcasting Co., 14 F. Supp. 2d 1080 (E.D. Wis. 1998), the plaintiff sued on a misrepresentation theory after the defendant failed to pay monetary sums designated under the contract and failed to provide the plaintiff with television air time as the parties previously agreed. The court explained: "The tort theories advanced in this case by Ice Bowl . . . add no facts to the contract claims but merely invoke new adjectives. There is but a single dispute in this case, and it is one sounding in contract." Ice Bowl, 14 F. Supp. 2d at 1082.

Unlike these cases, Marvin's fraud allegations are not reiterations of PPG's failure to perform future acts under the contract. Rather, Marvin's allegations concern misrepresentations of present, material facts, unrelated to the quality and efficacy of the product itself, which were untrue at the time of making. Marvin's fraud in the inducement claim should not fall to the wayside under this second category of cases.[5]

It is clear from the preceding case recitation that courts have been more likely to bar a fraud claim under the economic loss doctrine than to fit it under the "independent of the contract" exception. As the court in Budgetel Inns, Inc. v. Micros Sys., Inc., 8 F. Supp. 2d 1137, 1146 (E.D. Wis. 1998), noted, this may be a function of the basic inapplicability of the Huron Tool exception to fraudulent inducement claims. Nevertheless, courts have declined to apply the economic loss doctrine to fraudulent inducement-type claims in several instances. See e.g., United Int'l Holdings, 210 F.3d 1207 (applying Colorado law); Florian Greenhouse, Inc. v. Cardinal IG Corp.,

---

Likewise, the Florida Court of Appeals rejected a fraud claim based on defendants' failure to fulfill three contractually-related promises in Hotels of Key Largo, Inc. v. RHI Hotels, Inc., 694 So. 2d 74 (Fla. Dist. Ct. App. 1997). The defendants allegedly misrepresented: (1) plaintiffs would become part of the Radisson Hotels family and would participate in a worldwide reservation system; (2) plaintiffs would be the sole beneficiaries of the reservation system in the Florida Keys; and (3) more than forty percent of plaintiffs' room reservations would come from the reservation system and travel agents. When the defendants failed to come through on their promises, the plaintiffs alleged fraudulent inducement. The court rejected the claim, finding it not independent of the contract.

[5]I note that there are other cases out of Minnesota which are sometimes cited by courts applying the economic loss doctrine. See Upsher-Smith Lab., Inc. v. Mylan Lab., Inc., 944 F. Supp. 1411 (D. Minn. 1996); Nelson Distrib., Inc. v. Stewart-Warner Indus. Balancers, 808 F. Supp. 684 (D. Minn. 1992); ETM Graphics, Inc. v. City of St. Paul, No. C2-91-2103, 1992 WL 61394 (Minn. Ct. App. Mar. 31, 1992). This court in AKA cited these cases in support of its holding. A review of these three opinions, however, leave the reader without a clear understanding of the factual basis of the fraud claims.

11 F. Supp. 2d 521 (D.N.J. 1998) (applying New Jersey law–defendant's misrepresentation of terms of contract with plaintiff's competitor); Randolph v. Mitchell, 677 So. 2d 976 (Fla. Dist. Ct. App. 1996) (applying Florida law–agent's misrepresentation as to insurance coverage). Indeed, this court in AKA found that the concealment of an agreement between the defendant and a third party competitor to the plaintiff was sufficiently extraneous to avoid the application of the economic loss doctrine. See AKA, 137 F.3d at 1087. I also note that some courts have created a blanket exception for fraud or fraudulent inducement claims. See e.g., City of Richmond v. Madison Management Group, Inc., 918 F.2d 438 (4th Cir. 1990) (applying Virginia law); Cunningham v. PFL Life Ins. Co., 42 F. Supp. 2d 872 (N.D. Iowa 1999) (predicting Iowa law); HTP, Ltd. v. Lineas Aereas Costarricenses, S.A., 685 So. 2d 1238 (Fla. 1996) (applying Florida law).

D.    Conclusion

Based on the foregoing analysis, I would reverse: (1) the holding, contrary to Minnesota law, that Marvin qualifies as a merchant in goods of the kind; (2) the improper application of the economic loss doctrine to all fraud claims, contrary to Minnesota law; and (3) the rejection of Marvin's fraudulent inducement claim, assuming that non-collateral fraud claims are properly barred by the economic loss doctrine.

There can be little harm in sending the fraudulent inducement claim back to the jury, especially since the majority has decided to send the case back on the warranty issue. Unlike the claimants in Huron Tool, Marvin has pled fraud with sufficient specificity under Federal Rule of Civil Procedure 9(b). Marvin's Amended Complaint gives concrete, specific examples of the circumstances giving rise to its fraud claim. Once all the evidence is presented, the trial court can determine whether Marvin has met its burden of proof on the elements of fraudulent inducement. See Western Contracting Corp. v. Dow Chem. Co., 664 F.2d 1097, 1100-01 (8th Cir. 1981) (listing

the elements of fraud in the inducement under Minnesota law).  Thus, for the reasons stated, the district court's grant of summary judgment was in error.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.